LIVERSE (HYDE v.). See Case No. 6,972.

## Case No. 8,408.

LIVE–STOCK DEALERS' & BUTCHERS' ASS'N v. CRESCENT CITY LIVE–STOCK LANDING & SLAUGHTER–HOUSE CO. et al.

[1 Abb. U. S. 388; 3 Chi. Leg. News. 17; 13 Int. Rev. Rec. 20; 5 Am. Law Rev. 171; 1 Woods, 21.] [1]

Circuit Court, D. Louisiana. June 10, 11, 1870.

MONOPOLIES — EFFECT OF "CIVIL RIGHTS" ACT— ENJOINING STATE COURT.

1. Section 1 of the fourteenth amendment to the constitution applies to whites as well as colored people. as citizens of the United States; and is intended to protect them in their privileges and immunities as such, against the action. as well of their own state, as of other states in which they may happen to be.

[Cited in Baker v. State, 54 Wis. 371, 12 N. W. 12.]

[See note at end of case.]

2. These privileges and immunities do not consist merely in being placed on an equality with others; but embrace all the fundamental rights of a citizen of the United States as such.

[Cited in Railroad Tax Cases, 13 Fed. 773.]

3. One of these fundamental rights is the right to pursue any lawful employment in a lawful manner; or, in other words, the right to choose one's own pursuit. subject only to constitutional regulations and restrictions.

[Cited in Slaughterhouse Cases, 16 Wall. (83 U. S.) 106.]

[Cited in Re Jacobs, 98 N. Y. 107; Eastman v. State, 109 Ind. 279, 10 N. E. 97; State v. Goodwill, 33 W. Va. 182, 10 S. E. 285; McCullough v. Brown (S. C.) 19 S. E. 469.]

[See note at end of case.]

4. An exclusive privilege. granted to a few individuals, incorporated into a body politic. and to their successors. for twenty-five years. to have cattle landings, stock yards. and slaughter houses for several miles in extent in and around the city of New Orleans. with a prohibition to all other persons from having any such establishments in said district. is a restriction which violates the fundamental rights of other citizens willing to conform to all police regulations adopted for the public comfort and safety; and a legislative act granting such an exclusive privilege is a violation of the fourteenth amendment and void.

5. Such a law cannot be sustained under the right of the legislature to pass license laws and police regulations, and to grant exclusive rights for the exercise of public franchises. It allows certain privileged persons to pursue an ordinary employment, and prohibits others from so doing; and thus goes to establish one of those monopolies which are contrary to the spirit of a free government.

[1] [Reported by Benjamin Vaughan Abbott, Esq.. and here reprinted by permission. 5 Am. Law Rev. 171, contains only a partial report.]

6. If, however. the state courts sustain such a law, and attempt to enforce it. the circuit court cannot issue an injunction to stay proceedings, being prohibited by the act of 1793 [1 Stat. 333], and congress having passed no law to carry the fourteenth amendment into full effect. The remedy is to carry the suit to the highest state court. and then bring a writ of error to the supreme court of the United States.

[Cited in Louisiana State Lottery Co. v. Fitzpatrick, Case No. 8,541.]

7. By the civil rights bill. however, which, as far as it goes, covers the same grounds as the fourteenth amendment. the circuit court may take cognizance of a case like the present. and grant an injunction; except as to staying proceedings already commenced in a state court.

[Cited in Louisiana State Lottery Co. v. Fitzpatrick. Case No. 8,541; M. Schandler Bottling Co. v. Welch. 42 Fed. 565.]

Motion for an injunction, upon bill and answer.

The bill in this cause was filed by the Live Stock Dealers' and Butchers' Association, and others, complainants, against the Crescent City Live Stock Landing & Slaughter House Company, and the Board of Metropolitan Police of New Orleans, as defendants. The general object of the bill was to restrain the defendants from taking proceedings to suppress the business of the complainants, in slaughtering animals and selling meat. The defendants claimed the right to prosecute such proceedings, under a statute of Louisiana conferring the exclusive right to prosecute such business in New Orleans upon the Crescent City Company.

J. A. Campbell, for the motion.

W. H. Hunt and C. Roselius, opposed.

Before BRADLEY, Circuit Justice, and WOODS, Circuit Judge.

BRADLEY, Circuit Justice. The complainants, who are engaged in the live stock landing and slaughter house business, pray for an injunction against the defendants, commanding them to suspend all proceedings against the complainants under and by virtue of an act of the legislature of Louisiana of March 8, 1869 [Acts La. 170], giving to the corporation. defendants, the exclusive right to erect and have live stock landings and slaughter houses in and about New Orleans, which act the complainants allege to be in violation of the civil rights bill, passed April 9, 1866 [14 Stat. 27]. and the first section of the fourteenth amendment to the constitution of the United States; also, that the complainants may be protected in their rights to perform whatever may be lawful and proper in their behalf for any citizen of the state to do, including the defendants; and their right to slaughter, land, keep, maintain, and sell animals for food, and, when prepared for market, to sell and dispose of their meat, subject to no condition more severe than that of any other party. including the defendants; and that they be maintained in their rights to construct all suitable buildings,

structures for landing, keeping, and preserving animals for sale or use that are allowed to any other citizen of the state, including the defendants.

The application brings up the question whether the civil rights bill applies to such a case as the present, and whether the fourteenth amendment to the constitution is intended to secure to the citizens of the United States of all classes merely equal rights; or whether it is intended to secure to them any absolute rights. And, if the latter, whether the rights claimed by the complainants in this bill are among the number of such absolute rights. (After intimating an opinion—subsequently modified—that the civil rights bill did not apply to the case, the judge proceeds:)

The law in question, under which the acts complained of were committed, is one of a remarkable character. It was passed March 8, 1869, and is entitled "An act to protect the health of the city of New Orleans, to locate stock landings and slaughter houses, and to incorporate the 'Crescent City Live Stock Landing & Slaughter House Company.'" It enacts that after June 1, 1869, it shall not be lawful to land, keep, or slaughter any cattle, beeves, calves, sheep, swine, or other animals, or to have, keep, or establish any stock landing, yards, pens, slaughter houses, or abattoirs, at any point or place within the city of New Orleans or the parishes of Orleans, Jefferson, and St. Bernard, or at any point or place on the east bank of the Mississippi river within the corporate limits of New Orleans, or at any point on the west bank of the Mississippi above the present depot of the New Orleans, Opelousas, & Great Western Railroad Company, except that the Crescent City Live Stock Landing and Slaughter House Company may establish themselves at any point or place as hereinafter provided. A penalty of two hundred and fifty dollars is imposed for every violation of this section. Thus far, the act, barring the exception at the close, is a mere police regulation, and, no doubt, a very proper one. The territory named extends some eight or ten miles on each side the river Mississippi, and includes the entire city of New Orleans and a large extent of surrounding country.

The next section incorporates William D. Sanger and others, seventeen persons in all, and their successors, into a body politic and corporate, to be called "The Crescent City Live Stock Landing & Slaughter House Company."

The third section enacts that said corporation may establish and erect, at its own expense, at any point or place on the east bank of the Mississippi river, within the parish of St. Bernard, or the corporate limits of the city of New Orleans, below the United States barracks, or at any point or place on the west bank of the river, below the present depot of the Opelousas Rail-

road, wharves, stables, sheds, yards, and buildings necessary to land, stable, shelter, protect, and preserve all kinds of horses, mules, cattle, and other animals; and that said company shall have the sole and exclusive privilege of conducting and carrying on the live stock landing and slaughter house business within the limits and privileges granted by the provisions of this act. The section then enacts that all cattle and other animals destined for sale or slaughter in New Orleans or its environs, shall be landed and kept at these landings and yards, for which the company are to be paid certain fees named in the act; and, in default of payment, are to have the privilege of selling the cattle therefor; and every violation of these privileges by landing or yarding elsewhere, is to be subject to a penalty of two hundred and fifty dollars. The section goes on to require the company, by June 1, 1869, to build a grand slaughter house of sufficient capacity to accommodate all butchers, and in which to slaughter five hundred animals per day; also sheds, stables, &c., to accommodate all the stock received at this port, under penalty of forfeiting their charter.

The fourth section authorizes the company to erect landing places for live stock at any points or places consistent with the act, and to have the exclusive privilege of having landed thereon all animals intended for sale or slaughter in the parishes of Orleans and Jefferson; and to erect one or more slaughter houses at any points or places consistent with the act, and to have the exclusive privilege of having slaughtered therein all animals the meat of which is destined for sale in the parishes of Orleans and Jefferson.

Section 5 enacts the closing of all other stock landings and slaughter houses, after the completion of the company's, in the parishes of Orleans, Jefferson, and St. Bernard, and forbids any slaughtering therein under a penalty of one hundred dollars for every offense, and enacts that all animals to be slaughtered in the parishes of Orleans and Jefferson must be slaughtered in the slaughter houses erected by the company, and the company, on refusal to permit the same, will be subject to fine.

Section 6 provides for an inspector of cattle, to be appointed by the governor, to inspect all cattle to be slaughtered.

Section 7 fixes the fees to be paid to the company for slaughtering in their houses,— namely, one dollar apiece for all beeves, &c., besides the head, feet, gore, and entrails.

Section 9 authorizes the company to lay railroads from their buildings to the city, and to establish ferries across the Mississippi river.

Section 10 limits the charter to twenty-five years.

These are the provisions of the law. The complainants allege that they have been injured by its operation, and by the acts and

proceedings of the defendants under it. They state in their bill that for a long time past they have been engaged in the lawful prosecution of the live stock landing and slaughter house business, and in procuring, preparing, dressing, and vending of animal food for the markets of New Orleans and the parishes of Jefferson and Saint Bernard, and the steamers and other vessels engaged in the commerce of the same; and that more than a thousand persons were connected with the trade aforesaid, and that the corporation complainant was formed to prosecute the trade and to provide suitable houses and conveniences therefor, and that the said corporation and its members, to the number of two hundred and fifty persons. and others in their employ, to the number of two hundred persons, have been hitherto engaged in the said trade and business. They complain that their rights are invaded by the act in question; that the Crescent City Company have brought several hundred suits against them or some of them, have obtained injunctions, and in other ways vexed and harassed the complainants under color of the said act; that the decision and judgments of the state supreme court have been adverse to the complainants; and that although the said decision and judgments have been removed to the supreme court of the United States by writs of error, in such manner that said writs operated as a supersedeas, yet that the defendants have disregarded the same, and have applied to the eighth district court of the parish of Orleans, and have obtained a writ, which they call an injunction, directed to the Metropolitan Police Board, without making the complainants or any of them parties to the proceeding, by which said Metropolitan Police Board were commanded and enjoined to prevent all persons from landing, keeping, or slaughtering any cattle, beeves, calves, sheep, swine, or other animals, and from keeping or establishing any stock landings, yards, pens, slaughter houses, or abattoirs, at any point or place within the city of New Orleans, or the parishes of Orleans, Jefferson, and Saint Bernard, and to prevent any and all persons from selling or offering for sale in the city of New Orleans any animal for human food, not slaughtered and inspected at the slaughter house of said company; and that the said Metropolitan Police Board did thereupon seize and possess themselves of meat, to the value of twenty thousand dollars, which was in carts and vehicles on their way to the markets, and have kept the same open and exposed until it has spoiled. The bill contains other allegations showing that the complainants are exposed to a multiplicity of suits, to vexatious litigation, and to irreparable mischief and damage by the unjust acts and proceedings of the defendants, the Crescent City Company.

To this bill the defendants have filed an answer in the nature of a demurrer, object-ing, first, to the jurisdiction of this court, because the parties all reside in Louisiana, and the circuit court of the United States cannot enjoin proceedings in a state court. Secondly, that the bills set up the same matters which are set forth in a petition filed by the complainants in the state court, and decided by the supreme court of Louisiana, and from which decision a writ of error has been granted to remove the same to the supreme court of the United States. Thirdly, because the statute referred to is constitutional and valid, containing only police regulations, in no manner conflicting with the constitution of the United States, or the amendments thereof.

Before proceeding to examine the technical points raised by the defendants, we will discuss the main question arising upon the act of the legislature and the fourteenth amendment.

[As to the civil rights bill, we are clearly of opinion that it does not apply; that it was intended merely to secure to citizens of every race and color the same civil rights and privileges as are enjoyed by white citizens; and not to enlarge or modify the rights or privileges of white citizens themselves. The fourteenth amendment is much broader in its terms, and must be examined with more attention and care.] [2]

The constitution of the United States, before the adoption of the recent amendments, contained several provisions for the protection of the people in the enjoyment of their civil rights, liberties, and privileges, some of which were binding upon the government of the United States, and others upon the several states. Of the former kind were those which declared that the privilege of the writ of habeas corpus should not be suspended, unless when in cases of rebellion and invasion the public safety should require it; that no bill of attainder or ex post facto law should be passed; that no capitation or other direct tax should be laid, unless in proportion to the census; that the trial of all crimes shall be by jury, and shall be held in the state where committed; that no person shall be convicted of treason unless on the testimony of two witnesses to the same overt act, or confession in open court; that no attainder of treason shall work corruption of blood or forfeiture, except during the life of the person attainted, &c.

Those binding on the states were, that no state should make any thing but gold or silver coin a tender for payment of debts; nor pass any bill of attainder. ex post facto law, or law impairing the obligation of contracts; or lay any imposts or duties on imports or exports, except as provided in the constitution; and that the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states.

---

[2] [From 3 Chi. Leg. News, 17.]

The latter class of provisions could not be carried into effect by congressional legislation, and depended for their vindication upon the voluntary action of the state legislatures and such jurisdiction as the courts of the United States might have when a case arose in which one of these rights was violated.

Since the breaking out of the late war, several amendments to the constitution have been adopted, intended to protect the citizens from oppression by means of state legislation, and to confer upon congress the power by appropriate legislation, to carry the amendments into effect. Amongst these, the fourteenth amendment declares that all persons born or naturalized in the United States, and subject to its jurisdiction, are citizens of the United States, and of the state wherein they reside, and that no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

The new prohibition that "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States" is not identical with the clause in the constitution which declared that "the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." It embraces much more.

It is possible that those who framed the article were not themselves aware of the far reaching character of its terms. They may have had in mind but one particular phase of social and political wrong which they desired to redress. Yet, if the amendment, as framed and expressed, does in fact bear a broader meaning, and does extend its protecting shield over those who were never thought of when it was conceived and put in form, and does reach social evils which were never before prohibited by constitutional enactment, it is to be presumed that the American people, in giving it their imprimatur, understood what they were doing, and meant to decree what has in fact been decreed.

The "privileges and immunities" secured by the original constitution, were only such as each state gave to its own citizens. Each was prohibited from discriminating in favor of its own citizens, and against the citizens of other states.

But the fourteenth amendment prohibits any state from abridging the privileges or immunities of the citizens of the United States, whether its own citizens or any others. It not merely requires equality of privileges; but it demands that the privileges and immunities of all citizens shall be absolutely unabridged, unimpaired.

What, then, are the essential privileges which belong to a citizen of the United States, as such, and which a state cannot by its laws invade? It may be difficult to enumerate or define them. The supreme court, on one occasion, thought it unwise to do so. [Conner v. Elliot] 18 How. [59 U. S.] 591. But so far as relates to the question in hand, we may safely say it is one of the privileges of every American citizen to adopt and follow such lawful industrial pursuit—not injurious to the community—as he may see fit, without unreasonable regulation or molestation, and without being restricted by any of those unjust, oppressive, and odious monopolies or exclusive privileges which have been condemned by all free governments; it is also his privilege to be protected in the possession and enjoyment of his property so long as such possession and enjoyment are not injurious to the community; and not to be deprived thereof without due process of law. It is also his privilege to have, with all other citizens, the equal protection of the laws. Indeed, the latter privileges are specified by the words of the amendment.

These privileges cannot be invaded without sapping the very foundations of republican government. A republican government is not merely a government of the people, but it is a free government. Without being free, it is republican only in name, and not republican in truth, and any government which deprives its citizens of the right to engage in any lawful pursuit, subject only to reasonable restrictions, or at least subject only to such restrictions as are reasonably within the power of government to impose,—is tyrannical and unrepublican. And if to enforce arbitrary restrictions made for the benefit of a favored few, it takes away and destroys the citizen's property without trial or condemnation, it is guilty of violating all the fundamental privileges to which I have referred, and one of the fundamental principles of free government.

There is no more sacred right of citizenship than the right to pursue unmolested a lawful employment in a lawful manner. It is nothing more nor less than the sacred right of labor. This right is not inconsistent with any of those wholesome regulations which have been found to be beneficial and necessary in every state.

It is not inconsistent with the exclusive right to make, use, and vend to others, for a limited period, a new and useful invention which the grantee or patentee has produced from his own brains or ingenuity. Society only gives to him the temporary use of that which, without him, it would not have had the benefit of, and as a consideration of that benefit, and to encourage others to make like use of their powers.

It is not inconsistent with the exclusive right to use a franchise,—that is, a right to do what the legislature alone can authorize to be done. and which no private citizen has a right to do without such authority,—such

as to build and operate a railroad, to make a canal or turnpike, to establish a ferry, and other such public rights which involve a charge upon the public, and, in most cases, an exercise of the right of eminent domain. These franchises may be conferred upon a limited number of persons, natural or corporate, with power, and even exclusive power, to exercise them in certain localities, on certain terms, and under certain restrictions. Society obtains a consideration for the grant of these franchises in the investment of large amounts of capital in public improvements, which are required for the development of the country and its resources. They are franchises which can only be exercised as they are conferred by public authority, and cannot be exercised and enjoyed by all. They are far different from those ordinary pursuits and employments of mankind which all citizens may properly and lawfully follow as their inclination leads them, and as the laws of demand and supply will allow.

Again, this fundamental right of labor is not inconsistent with that large class of cases in which the laws require a license or a certificate of requisite qualifications for admission to a particular employment or profession. No doubt there are many such, as to which the interests of society require that due preparation should be made and due qualifications should be possessed, before a person shall be allowed to enter them. But then they are open to all alike. None are excluded from the race of honorable competition by which to enter those employments, or by which to attain their honors. There is no corporate and exclusive guild of privileged individuals to which they are confined, and beyond the sacred pale of which there is no hope of admittance or promotion.

Nor is it inconsistent with the granting of a limited number of municipal licenses to follow certain pursuits, such as vending of intoxicating drinks, selling of drugs, or even selling of meats and keeping a market therefor. Public policy may require that these pursuits should be regulated and supervised by the local authorities, in order to promote the public health, the public order and the general well being. But they are open to all proper applicants, and none are rejected except those who fail to exhibit the requisite qualifications and guarantees, or who, after proper selections are made, would increase the number beyond what the interests and good order of society would bear. In those cases, none are excluded for the purpose of sustaining a monopoly. But each application is, or at least is supposed to be, examined on its own merits. All these systems of regulation are useful and entirely competent to the governing power; and are not at all inconsistent with the great right of liberty of pursuit, which is one of the fundamental privileges of an American citizen.

The next question is: Does the law com-

plained of, and the proceedings under it, conflict with the enjoyment of this fundamental privilege of the complainants; or is it only such a political and police regulation as it is competent for a state legislature to make? The legislature has an undoubted right to make all police regulations which they may deem necessary (not inconsistent with constitutional restrictions) for the preservation of the public health, good order, morals, and intelligence; but they cannot [interfere with liberty of conscience, nor with the entire equality of all creeds and religions before the law. Nor can they,] [3] under the pretense of a police regulation, interfere with the fundamental privileges and immunities of American citizens. The question has its limits in both directions; and whilst we are to be specially careful not to do any thing that may trench upon the vast and almost limitless field of legislation, where the will of the people is supposed to be most freely and powerfully expressed, it is nevertheless our duty, with a firm and unflinching hand, to prevent the invasion of any clear and undoubted individual rights of the citizen which are secured to him by the constitution.

So far as the act of the legislature of Louisiana is a police regulation, it is, of course, entirely within its power to enact it. It is claimed to be nothing more. But this pretense is too bald for a moment's consideration. It certainly does confer on the defendant corporation a monopoly of a very odious character. If it be not fairly and fully within the definition of a monopoly given in the great case of monopolies (11 Coke, 85), it is difficult to conceive of a case which would be within it. But it is not sufficient to show that it is a monopoly and void at common law, for the legislature may alter the common law, and may establish a monopoly, unless that monopoly be one which contravenes the fundamental rights of the citizen protected by the constitution. We have already seen that some monopolies are legal, if not politic. But is this such a one as will be endured in a free country, under a constitution which guarantees to the citizen his fundamental privileges and immunities? This is the precise question for us to decide. And we admit that the question is one of great delicacy and embarrassment. When the question was first presented, our impressions were decidedly against the claim put forward by the plaintiffs. But the more we have reflected on the subject, the more we are satisfied that the fourteenth amendment of the constitution was intended to protect the citizens of the United States in some fundamental privileges and immunities of an absolute and not merely of a relative character. And it seems to us that it would be difficult to conceive of a more flagrant case of violation of the fundamental rights of labor than the one before us.

---

[3] [From 3 Chi. Leg. News, 17.]

It was very ably contended, on the part of the defendants, that the fourteenth amendment was intended only to secure to all citizens equal capacities before the law. That was at first our view of it. But it does not so read. The language is, "No state shall abridge the privileges or immunities of citizens of the United States." What are the privileges and immunities of citizens of the United States? Are they capacities merely? Are they not also rights?

In the case before us, the citizen has chosen a lawful and useful employment. He has been brought up to it, and educated in it. He has invested property in it. He is willing to comply with all police regulations, properly such, in the exercise of it. He will not offend in any particular the regulations which the legislative or the municipal authorities may adopt. He will observe times, seasons, places, localities. But all these are not enough. He is required to land his cattle on a privileged person's landing; to keep them in that person's yard or pen; to slaughter them in that person's house, and to pay a burdensome toll for these restrictions. He may construct a landing, a yard, a slaughter house equally as good, within the prescribed limits of locality, and subject to all the necessary regulations; but that will not do. He must go to the privileged person and use his premises, and pay for their use.

This is not because the privileged person is the inventor of such accommodations, nor because the use of them is a franchise lying only in the public grant, nor because the privileged person is qualified by superior education and license, nor because he has received a municipal license as a herdsman or a butcher, but because he has obtained the exclusive privilege granted by the act.

The ipse dixit of the legislature assigns a lawful and ordinary employment to one set of men, and denies and forbids it to another. The injustice perpetrated under acts of irresponsible legislation has become a crying evil in our country. And while it must generally be without redress, except through the action of the elective body or the local courts, yet in those instances where the federal constitution has provided a remedy, we ought not to shrink from granting the appropriate relief. We do not give any weight to imputations upon the honesty or integrity of the legislature, the courts, or the executive of this state. We are not authorized to do so. We are bound to presume, and do presume, that they have severally acted in good faith, and with an honest purpose not to transcend the limits of their constitutional powers. They have their duties to perform; we have ours. And whilst we feel it due to them to examine their acts with great caution and due respect, we nevertheless feel bound to exercise an independent judgment. Unless this be done by all who have public duties to perform. there will be no certain foundation to stand upon.

In the exercise of that judgment, we feel compelled to decide that the act in question is a violation of one of the fundamental privileges of the citizen, and that an injunction would have to be granted substantially as prayed for, but for one of the technical objections raised by the answer of the defendants.

[The defendants to the bill had filed an answer, in the form of a demurrer, objecting first to the jurisdiction of the court, because all the parties resided in Louisiana, and the circuit court of the United States could not enjoin proceedings in the state courts.

[Secondly, that the bill sets up the same matter which was set forth in the petition filed by the plaintiffs, in the state court, upon which a decision was rendered, and from which a writ of error had been granted.

[Thirdly, because the statute referred to was constitutional and valid, containing only police regulations, in no manner conflicting with the constitution of the United States and the fourteenth amendment.] [4]

The objection that the circuit court of the United States cannot enjoin proceedings in the state court, is an objection which cannot be surmounted. The fourteenth amendment authorizes congress, by appropriate legislation, to carry its provisions into effect. Congress, in the exercise of the power thus given, would undoubtedly have the right to authorize the federal courts to take jurisdiction of cases of this sort. and to enjoin proceedings in the state courts, as well as proceedings in the federal courts. But congress has not as yet assumed that jurisdiction, and therefore the court are left to the provisions regulating the proceedings of the United States courts passed seventy or eighty years ago. Section 3 of the act of 1793 declares that no writ of injunction shall be granted to stay proceedings in any court of a state. This act has never been repealed. The court, therefore, feel compelled to refuse the injunction to restrain the defendants from proceeding with the legal remedy which they have instituted in the state courts.

The remedy of the parties is to allow the proceedings to pass to judgment, and if the highest court of the state should decree against the construction of the fourteenth amendment which is claimed by them, and which this court has assented to, then they can carry the case up by writ of error to the supreme court of the United States, and have the whole question reviewed.

[For reasons orally assigned, considering that this court is without power to enjoin process from the state court and other objections raised to the jurisdiction. it is ordered and decreed that the injunction applied for by the complainants be denied with costs.] [4]

---

[4] [From 3 Chi. Leg. News, 17.]

At the opening of the court on Saturday morning, June 11, Justice BRADLEY made the following announcement:

In the Slaughter House Case yesterday [Case No. 12,938], we expressed the opinion that the civil rights bill did not apply to the case; that it was intended merely to secure to all citizens, of every race and color, the same privileges as white citizens enjoy, and not to modify or enlarge the latter. This portion of the opinion was not written at the time, and was somewhat hastily expressed. Our attention had been chiefly given to the main question—the true construction of the fourteenth amendment. On a more careful examination, considering that the civil rights bill was enacted at the same session, and but shortly before the presentation of the fourteenth amendment; was reported by the same committee; was in pari materia; and was probably intended to reach the same object, we are disposed to modify our opinion in this respect, and to hold, as the counsel on both sides seem to agree in holding, that the first section of the bill covers the same ground as the fourteenth amendment, at least so far as the matters involved in this case are concerned.

And while we still hold that the act is not intended to enlarge the privileges and immunities of white citizens, it must be construed as furnishing additional guarantees and remedies to secure their enjoyment; and this is probably the reason why congress has neglected to pass an additional law for carrying the fourteenth amendment into effect, the civil rights bill being regarded as having already supplied the necessary provisions for that purpose.[6] Still, this bill has not repealed the law which prohibits the federal courts from issuing an injunction to stay proceedings at law in the state courts. The prayer for injunction will, therefore, stand denied to that extent, but granted as to the residue, and the rule will be corrected accordingly.

In pursuance of this announcement, the following decree was made in the case:

This cause came on before the court upon a motion for a special injunction, and was argued by counsel for the plaintiffs and defendants, and thereupon it is declared by the court that the said plaintiffs are entitled to land, keep, or slaughter any cattle, beeves, calves, sheep, swine, or other animals, and to have, keep, or establish any stock landing, yard, pens, slaughter houses, or abattoirs at any point or place on the east bank of the Mississippi river within the limits of the parish of Saint Benard, or in the corporate limits of the city of New Orleans below the United States barracks, or at any point on the west bank below the present depot of the New Orleans, Opelousas, and Great Western Railroad Company, to the same extent of right as the said Crescent City Live Stock Landing and Slaughter House Company have and enjoy, subject to inspection, and such other police regulations as said company, and others engaged in like employment, are subject to; and that the said parties (plaintiffs) may carry on the live stock landing and slaughter house business, and may prepare animal food for market, and may vend and dispose of the same, and may keep and maintain animals for sale, and erect wharves, sheds, stables, and yards, and do whatever it may be lawful for the said defendants to do under the terms of their act of incorporation as an exclusive privilege, subject to like regulations as aforesaid; and the court directs that an injunction be issued from this court, enjoining and restraining the defendants from commencing or prosecuting any other suits upon their act of incorporation than such as are now pending against the said plaintiffs, or either of them, for doing or performing any act embraced in the declarative clause of this decree, or from suing for any fine or penalty imposed in said act of incorporation, or for doing or performing any of the acts aforesaid, and from interfering with them in the prosecution of their lawful occupations as live stock dealers, or butchers, or as vendors of animal food or animals.

And the said court here excepts from the operation of this decree, the proceedings in any of the courts of the state that are now pending, but reserves to the said plaintiffs all other remedies for their protection contained in the constitution of the United States and act of congress, whereby in the lawful pursuits aforesaid, they may be deprived of the rights here declared and ascertained.

[NOTE. There were pending at the time this case was decided, as noted in the decision above, quite a number of suits in the state courts, all involving the same question, in some of which the Cresent City Live Stock Landing & Slaughter House Company were plaintiffs and in some defendants. The cases were taken to the supreme court of the state of Louisiana upon appeals, and were decided in favor of the slaughter house company (State v. Fagan, 22 La. Ann. 547); whereupon the several parties against whom the decisions were rendered sued out writs of error in the supreme court of the United States. They then moved for writs of supersedeas in the same court. The motion was denied. 10 Wall. (77 U. S.) 273. The case was subsequent to this heard upon error. The constitutionality of the act of the Louisiana legislature of March 8, 1869, was attacked upon the grounds that the statute created a monopoly, and conferred odious and exclusive privileges upon a few at the expense of the whole population of New Orleans; that it would deprive a large and meritorious class of the citizens—all of the butchers of the city—of the right to exercise their trade, the business in which they have been trained, and upon which they depend for support. The opinion of the supreme court of Louisiana was affirmed upon the ground that the grant of the exclusive right to the slaughter house company for their abattoir was a police regulation for the

---

[6] An act for carrying into effect the fourteenth and fifteenth amendments was approved by the president on May 31, but had not obtained publicity at the time this decision was rendered. Section 18 of this act re-enacts the civil rights bill, and thus impliedly adopts it for the purpose of carrying the fourteenth amendment into effect.

health and comfort of the city, and that it was within the power of the legislature to pass such an act. Said Mr. Justice Miller, who delivered the opinion of the court: "It is true that it grants, for a period of twenty-five years, exclusive privileges. And whether those privileges are at the expense of the community in the sense of a curtailment of any of their fundamental rights, or even in the sense of doing them an injury, is a question open to considerations to be hereafter stated." That it does not curtail any of their fundamental rights the learned justice considered clear. Continuing, he said: "The wisdom of the monopoly granted by the legislature may be open to question, but it is difficult to see a justification for the assertion that the butchers are deprived of the right to labor in their occupation, or the people of their daily service in preparing food, or how this statute, with the duties and guards imposed upon the company, can be said to destroy the business of the butcher, or seriously interfere with its pursuit." The contention so strenuously insisted upon in the Louisiana state courts and also considered by Mr. Circuit Justice Bradley above, that the act in question is in violation of the thirteenth and fourteenth amendments to the constitution, the learned justice considers untenable. The purposes of these amendments were to secure to the negro, newly emancipated, protection from injustice and hardships arising under state laws discriminating against him as a class. The inhibition preventing the states from passing laws abridging the privileges and immunities of citizens of the United States cannot be taken to mean other privileges and immunities than such as were within the purview of the constitutional amendment. Continuing, the learned justice said: "Was it the purpose of the fourteenth amendment, by the simple declaration that no state should make or enforce any law which shall abridge the privileges and immunities of the citizens of the United States, to transfer the security and protection of all the civil rights which we have mentioned, from the states to the federal government? And where it is declared that congress shall have the power to enforce the article, was it intended to bring within the power of congress the entire domain of civil rights heretofore belonging exclusively to the states? All this and more must follow, if the proposition of the plaintiffs in error be sound. For not only are the rights subject to the control of congress whenever in its discretion any of them are supposed to be abridged by state legislation, but that body may also pass laws in advance, limiting and restricting the exercise of legislative power of the states, in their most ordinary and usual functions, as in its judgment it may think proper on all such subjects." Mr. Chief Justice Chase, Mr. Justice Field, Mr. Justice Swayne, and Mr. Justice Bradley dissented, the last three of whom delivered dissenting opinions. 16 Wall. (83 U. S.) 36. After the decision above, the people of the state of Louisiana adopted a new constitution, which, among other things, in reference to the slaughter of cattle and other live stock in the municipalities of the state, enacted "that no monopoly of exclusive privilege shall exist in this state nor such business be restricted to the land or houses of any individual or corporation." The city of New Orleans granted a permit to a new company, the Butchers' Union Slaughter House Company, to erect within the city an abattoir and other necessary buildings, and to conduct the business of slaughtering cattle. The Crescent City Company, above, brought suit against the Butchers' Union Company in the circuit court for the Eastern division of Louisiana, setting up its exclusive right and privilege, and declaring that the ordinance of the city of New Orleans violated the federal constitution in impairing the validity of the contract entered into by the Crescent City Company at the time of building their works. The injunction asked for by them was granted by the circuit court (case not reported) from which decision an appeal was taken to the supreme court upon the ground that the exclusive right originally granted to the plaintiff was valid

only as an exercise of the police power of the state, and was of that character, having reference to the public health; that it could not be made the subject of contract, and protected against subsequent legislation by the constitution of the United States. 111 U. S. 746, 4 Sup. Ct. 652. Upon the preliminary injunction granted in the case the plaintiff gave bond. Upon this bond defendant subsequently entered suit in the state court, in which he recovered judgment, which was affirmed upon appeal to the supreme court of the state, and was brought in error to the supreme court of the United States, which partially reversed the supreme court of Louisiana. 120 U. S. 141, 7 Sup. Ct. 472.]