# PACIFIC STATES TELEPHONE AND TELEGRAPH COMPANY v. OREGON.

## ERROR TO THE SUPREME COURT OF THE STATE OF OREGON.

No. 36. Argued November 3, 1911.—Decided February 19, 1912.

The enforcement of the provision in § 4 of Art. IV of the Constitution that the United States shall guarantee to every State a republican form of government is of a political character and exclusively committed to Congress, and as such is beyond the jurisdiction of the courts.

The provisions of § 4 of Art. IV of the Constitution do not authorize the judiciary to substitute its judgment as to a matter purely political for the judgment of Congress on a subject committed to Congress.

Under § 4 of Art. IV of the Constitution, it rests with Congress to decide what government is the established one in a State, and its decision is binding on every other department of the Government, and cannot be questioned by the judiciary. *Luther* v. *Borden*, 7 How. 1.

A statute otherwise constitutional cannot be attacked in the courts on the ground that it was adopted in pursuance of provisions in the constitution of the State which render the form of government of  the State unrepublican in form within the meaning of § 4 of Art. IV of the Constitution. The courts have no jurisdiction of the question; it is for Congress to determine.

Where the claim that one taxed under a state statute is deprived of property without due process of law is not based on any inherent defect in the law, or infirmity of power of State to levy it, but on the ground that the government of the State is not republican in form, the question is not within the jurisdiction of the courts.

The judicial power of the United States will not be extended so as to interfere with the authority of Congress or of the Executive so as to make the guarantee contained in § 4 of Art. IV of the Constitution  one of anarchy instead of order. *Luther* v. *Borden*, 7 How. 1.

Whether the adoption of provisions for the initiative and referendum in the constitution of a State, such as those adopted in Oregon in  1902, so alter the form of government of the State as to make it no longer republican within the meaning of § 4 of Art. IV of the Con-

stitution, is a purely political question over which this court has no jurisdiction.

Writ of error to review 53 Oregon 162, dismissed.

THE facts, which involve the constitutionality under § 4 of Art. IV of the Federal Constitution of the initiative and referendum provisions of the constitution of the State of Oregon, are stated in the opinion.

*Mr. E. S. Pillsbury,* with whom *Mr. Oscar Sutro* was on the brief, for plaintiff in error:

The initiative and the tax measure in question are repugnant to the equal protection provision of the Fourteenth Amendment.

That Amendment controls the action of all branches of the Government, legislative, executive and judicial. *Ex parte Virginia,* 100 U. S. 339–347; *Yick Wo* v. *Hopkins,* 118 U. S. 356, 373; *Scott* v. *McNeal,* 154 U. S. 34; *Blake* v. *McClung,* 172 U. S. 232.

The initiative act under which the license tax is claimed in this suit was "enacted" by a vote of 69,635 in favor of the same and 6,441 against. The total vote for Governor at this election was 96,751 so that 20,675 of the electors did not vote on this measure.

To compel plaintiff in error to pay this tax would not accord to it the equal protection of the laws, nor the protection of equal laws, because this exaction is peculiar to plaintiff in error, and the few others included in these two acts, and is based upon alleged legislation which, for said period, is entirely different in character and in the manner of enactment, from that which pertains to the taxation of all other residents of the State who have only been subject to tax laws passed by the Legislative Assembly.

The power of taxation belongs exclusively to the legislative branch of the Government; it is lodged nowhere else. *United States* v. *New Orleans,* 98 U. S. 392.

Representation and taxation must go together. *Harvard* v. *St. Clair Drainage Co.*, 51 Illinois, 135.

The test of the constitutionality of a statute is not what has been done but what by its authority may be done. *Ames* v. *People*, 26 Colorado, 83.

There can be but one source of legislation, but one law-making power in a State; that power must be a legislature chosen and acting as contemplated by the Federal Constitution.

The right of the taxpayer to a hearing as to the amount of his tax, extends to the legislature when the same is determined by that body. Cooley, Const. Lim., 7th ed., 497; 2 Story on Const., § 1894.

The powers of taxation which might be exercised through initiative legislation would be violative of the implied rights to the protection of property which pertain to every person under the Federal Constitution. *Loan Association* v. *Topeka*, 20 Wall., 662.

By the initiative and referendum amendment no measure passed by the legislature, affecting taxation, can become a law until approved by the people at a regular general election, and none of the restrictions of the Constitution apply to measures of taxation so approved or initiated by the people.

The vote on this amendment was 44,171 for and 42,127 against. The total vote for Governor at the same election was 117,690, being 31,392 greater than the entire vote on this amendment. Under the Oregon plan it is a majority of those voting on a proposition, not a majority of all the voters, which determines the result; so that, under this rule, the amendment in question was adopted by a fraction over 37½ per cent of those voting at the same election for Governor.

The initiative amendment and the tax in question levied pursuant to a measure passed by authority of the initiative amendment violate the right to a republican form of

government which is guaranteed by § 4 of Art. IV of the Federal Constitution. That guaranty is to the people of the States, and to each citizen, as well as to the States as political entities, and amounts to a prohibition against the majority in any State adopting an unrepublican constitution. *Appeal of Allyn,* 81 Connecticut, 534; Cooley, Const. Lim., 7th ed., p. 62.

The power of the people of a State to amend or revise their constitution is so limited by the Constitution of the United States that it cannot abolish the republican form of government. *Koehler* v. *Hill,* 60 Iowa, 543; Von Holst, Const. Law of U. S., 236, 237.

As to the effect of the Constitution as a fundamental restriction upon the people of the States in the formation of their governments, see Patrick Henry's speech, Elliott's Debates, vol. III, p. 55; Black's Const. Law, 2d ed., 262; *Rice* v. *Foster,* 4 Harr. (Del.) 479; *Minor* v. *Happersett,* 21 Wall. 162; *Martin's Exrs.* v. *Martin,* 20 N. J. Eq. 421.

The power of the majority of the people to impose upon a State a democratic form of government, or to adopt institutions violating the republican form, is one of the powers which was not intended to be exercised by anyone but to be wholly annihilated.

Taxation by the initiative method violates fundamental rights and is not in accordance with the law of the land (U. S. Const., Art. VI). *State* v. *Allmond,* 2 Houst. 612, 639. See also *Martin's Exrs.* v. *Martin,* 20 N. J. Eq. 421; Cooley, Const. Lim., 7th ed., p. 62; Fiske, Critical Period American History, 250.

The sovereign power of the States over their citizens is subordinate to the power of the National Government over its citizens. *Koehler* v. *Hill, supra; Crandall* v. *Nevada,* 6 Wall. 35; *Lane County* v. *Oregon,* 7 Wall. 76; Story on the Const., § 318, vol. I, 227; Elliott's Debates, vol. V, 239.

The citizens of the United States receive from the Federal Government the protection of the rights which are conferred upon them by their national citizenship. The majority of the people of a State cannot, even by amendment of the State's organic law, encroach upon these privileges. *United States v. Cruikshank*, 92 U. S. 542, 549.

Legislation by representatives elected for that purpose is the distinguishing feature of a republican form of government.

The duty to provide a republican form of government was originally assumed by the States; and it still remains there. And the maintenance of the right is guaranteed to the people of the States by the National Government. Const., U. S., Art. IV, § 4; *Texas v. White*, 7 Wall. 730.

Every citizen of the United States is entitled to the protection of the Federal Government in his right to be governed by laws enacted only by representatives elected for that purpose, and in accordance with a republican form of government. Such is the "law of the land." Const., U. S., art. IV, § 6.

As to meaning of the phrase "the law of the land," see *University of Maryland v. Williams*, 9 Gill & J. 365, 412; *Murray v. Hoboken Land Co.*, 18 How. 272; *Ex parte Virginia*, 100 U. S. 339; *Ex parte Ah Fook*, 49 California, 402; *Allgeyer v. Louisiana*, 165 U. S. 578.

The edicts of a multitude could not be the basis of due process, however fair the steps prescribed. Laws must emanate from the law-making power, and in a constitutional republic that power can only be a representative legislature created in accordance with the organic law.

The acts of a state legislature will not be declared unconstitutional unless in violation of some constitutional provision. The same principle must be applied to the acts of the States exercising their residuary sovereignty through any other of the departments of government, or through the people directly. *Holden v. Hardy*, 169 U. S.

389; *Loan Association* v. *Topeka,* 20 Wall. 655; *C. W. & Z. R. R. Co.* v. *Clinton County,* 1 Oh. St. 77, 87; *Parker* v. *Commonwealth,* 6 Barr. 507; and see *Maynard* v. *Commissioners,* 84 Michigan, 228, 239; *Commissioners* v. *Moir,* 199 Pa. St. 534; *People* v. *Hurlbut,* 24 Michigan, 44.

An oligarchy or a democracy is equally unrepublican; each was equally hateful to the founders of our government, and each is equally subversive of the structure which they erected. *Lexington* v. *Thompson* (Ky.), 68 S. W. Rep. 477; *Downes* v. *Bidwell,* 182 U. S. 244. And see *Wilkinson* v. *Leland,* 2 Pet. 657; *Terrett* v. *Taylor,* 9 Cranch, 43; *Bradshaw* v. *Rogers,* 20 Johns. 102; *Camp* v. *Rogers,* 44 Connecticut, 291; *State* v. *Williams College,* 9 Gill & J. 365; *People* v. *Humphrey,* 23 Michigan, 471.

Apart from the guaranty clause, all citizens of the United States may demand government in conformity with republican principles; No. 84 of the Federalist Hamilton; XII Hamilton's Works, 327; Madison, "Federalist" No. 44; XI Hamilton's Works, 370; 3 Elliott's Debates, 451; *Minor* v. *Happersett,* 21 Wall. 161; *United States* v. *Cruikshank, supra.*

The initiative is in contravention of a republican form of government. Government by the people directly is the attribute of a pure democracy and is subversive of the principles upon which the republic is founded. Direct legislation is, therefore, repugnant to that form of government with which alone Congress could admit a State to the Union, and which the State is bound to maintain.

For difference between a republic and democracy, see Webster's Dictionary; *Downes* v. *Bidwell,* 182 U. S. 279; Cooley's Const. Lims. 194; *Minor* v. *Happersett,* 21 Wall. 162; *In re Duncan,* 139 U. S. 461; 15 Jefferson's Writings, 452; Burgess, Pol. Science and Compar. Const. Law, Vol. I; Black's Const. Law, 28; Bartlett, Digest Election Cases, 446; *Ex parte Farnsworth,* 135 S. W. Rep. 537:

1 Story, Const. 388; *Ex parte Anderson*, 134 California, 74; Yeaman's, "Study of Government."

The direct exercise of the powers of government by the people at large would remove from a republic the feature which distinguishes it from a democracy. That government cannot be said to be representative in which the people at large are the legislators. *People* v. *Collins*, 3 Michigan, 343, 399; *State* v. *Swisher*, 17 Texas, 441; *Rice* v. *Foster*, 4 Harr. 479; *Ex parte Wall*, 48 California, 279; *State* v. *Harris*, 2 Bailey, 598; Federalist, No. 51.

In ascertaining the meaning of the phrase "republican form of government" the debates of the constitutional conventions and the Federalist papers are of great importance, if not conclusive. *McCullough* v. *Maryland*, 4 Wheat. 419; *Cohens* v. *Virginia*, 6 Wheat. 418; *Pollock* v. *Farmers' Tr. Co.*, 158 U. S. 601; *McPherson* v. *Blacker*, 146 U. S. 1; *Rhode Island* v. *Massachusetts*, 12 Pet. 657.

The framers of the Constitution recognized the distinction between the republican and democratic form of government, and carefully avoided the latter. "Federalist," No. 48; XII Hamilton's Works, 28; 2 Elliott's Debates, 253; 5 Elliott's Debates, 136 *et seq.*; and see 3 Elliott's Debates, 225, 233, for views of John Marshall, afterwards Chief Justice.

The extent of territory of the States alone sufficed, in the judgment of the framers of the Constitution, to condemn the establishment of a democratic form of government. Federalist, No. XIV; Hamilton's Works, Vol. XI, 101, 103; Madison in Federalist, No. X; Hamilton's Works, Vol. XI, 75.

The form of state government perpetuated by the Constitution was the republican form with the three departments of government, in force in all the States at the time of the adoption of the Constitution. 5 Elliott's Debates, 239.

Initiative legislation is invalid because government by

the people directly is inconsistent with our form of government.

The vital element in a republican form of government, as that phrase is used in American political science, is representation. Legislation by the people directly is the very opposite, the negative of this principle. It can, therefore, have no place in our form of government. Indeed, it has been repeatedly said to be contrary to and subversive of the structure of our republic. *In re Duncan, supra; State* v. *Swisher,* 17 Texas, 448; *Rice* v. *Foster,* 4 Harr. (Del.) 479; *Clarke* v. *Rochester,* 28 N. Y. 606, 633.

The well-known practices of adopting state constitutions by popular vote, and of local legislation in "town meetings" furnish no precedent for the lodgment of legislative power in the ballot-box.

The Federal Constitution presupposes in each State the maintenance of a republican form of government and the existence of state legislatures, to wit: representative assemblies having the power to make the laws; and that in each State the powers of government will be divided into three departments: a legislature, an executive and a judiciary, one of these, the legislature, is destroyed by the initiative.

State legislatures are a vital feature of our government; the Federal Constitution presupposes their existence and imposes on each State the obligation to maintain them.

The division of powers of the three departments in each of the States is a prerequisite to the National Government.

Under the Constitution the state legislatures are the agency to carry on the relations between the Nation and the States.

The word "legislature" in the Constitution means a representative assembly consisting of two houses, empowered to make the law. Such was its meaning at the time of the adoption of the Constitution.

Words and terms are to be taken in the sense in which

they were used when the Constitution was adopted. *Veazie Bank* v. *Fenno*, 8 Wall. 542; *Locke* v. *New Orleans*, 4 Wall. 172; *United States* v. *Harris*, Abb., U. S. 110; *United States* v. *Block*, 4 Sawy. 211; *Fox* v. *McDonald*, 101 Alabama, 51; Bancroft, Hist. of U. S. IX, 260 *et seq.*; *Evansville* v. *The State*, 118 Indiana, 426, 441.

Contemporaneous legislation by Congress sheds some light on the meaning of the term "legislature" as used in the Constitution. The initiative destroys the legislative assemblies or legislatures which it is the implied obligation of each State to maintain, for a legislature must be the law-making power.

Unless supreme within its jurisdiction a legislative assembly is not a legislature. Blackstone, Comm., Vol. I, 46; Law of the Const. 66; Federalist, Nos. 33, 75.

Two coördinate legislative authorities, each with equal power of making, repealing and amending laws, would be political anarchy and chaos.

The initiative overthrows one of the greatest safeguards against the abuse of the power of legislation, to wit: the system of a dual legislative assembly.

The provision in the Oregon constitution for direct legislation violates the provisions of the Act of Congress admitting Oregon to the Union. Act of Congress, February 14, 1859, 11 Stat. 383; *Romine* v. *State*, 34 Pac. Rep. 925; *People* v. *Adams*, 73 Pac. Rep. 866.

The State of Oregon was admitted because its proposed government was republican. The implied contract was that the State would continue that form. Every person within the State is entitled to that form of government. The State cannot secede from the Union. A change in its fundamental law, repugnant to republican institutions, is contrary to the act of Congress admitting the State, and is an impairment of the obligation of the State to preserve a republican form of government. Tiedeman, Unwritten Const. of the U. S. 164.

It is the power of this court to maintain and preserve this government against the attack of direct legislation and the absolutism of numbers.

The questions whether the "measure" in issue constitutes due process of law and affords plaintiff in error the equal protection of the law, and whether this "measure" in the method of its enactment violates the various provisions of the Federal Constitution designated in the opening brief, are contentions which this court must decide in the exercise of its jurisdiction and are not political.

*Luther* v. *Borden,* 7 How. 1; *Texas* v. *White,* 7 Wall. 730; *Taylor* v. *Beckham,* 178 U. S. 548; *In re Duncan,* 139 U. S. 449; *Hopkins* v. *Duluth,* 81 Minnesota, 189, cited by defendant in error, do not sustain the contention that the questions are political and not within the jurisdiction of this court.

The courts have never held that a cause was not justiciable because it involved an interpretation of Art. IV, § 4, but have in proper cases construed the language of that clause. *Chisholm* v. *Georgia,* 2 Dall. 419; *In re Duncan,* 139 U. S. 449; *Hopkins* v. *Duluth,* 81 Minnesota, 189; *In re Pfahler,* 150 California, 71; *People* v. *Sours,* 31 Colorado, 369; *Kadderly Case,* 44 Oregon, 118; *People* v. *Johnson,* 38 Colorado, 76; *Elder* v. *Colorado,* 86 Pac. Rep. 250; aff'd, 204 U. S. 85; *Forsyth* v. *Hammond,* 166 U. S. 519; *South Carolina* v. *United States,* 199 U. S. 437, 454.

The right to a republican form of government is a substantial right. Like the franchise to vote, it is a political right. This has always been held to be within the protection of the courts. *Capen* v. *Foster,* 12 Pick. 485, 489; *Yick Wo* v. *Hopkins,* 118 U. S. 369; *Florida* v. *Georgia,* 17 How. 478, 494; *Virginia* v. *West Virginia,* 11 Wall. 54; *Boyd* v. *Thayer,* 143 U. S. 135; *Cohens* v. *Virginia,* 6 Wheat. 378.

If from the questions it appears that some title, right,

privilege or immunity on which the recovery depends
will be defeated by one construction of the Constitution
or law of the United States or sustained by the opposite
construction, the case will be one arising under the Con-
stitution or laws of the United States, otherwise not.
*Starin* v. *New York City*, 115 U. S. 257; *Osborn* v. *Bank of
United States*, 9 Wheat. 824; *Mayor* v. *Cooper*, 6 Wall. 252;
*Tennessee* v. *Davis*, 100 U. S. 264; *Railroad Co.* v. *Missis-
sippi*, 102 U. S. 140; *Kansas Pac. R. R.* v. *Atchison R. R.
Co.*, 112 U. S. 416; *Cooke* v. *Avery*, 147 U. S. 384, 385; *Con-
solidated Gas Co.* v. *Willcox*, 212 U. S. 19, 40.

The action of Congress in receiving Senators and
Representatives from Oregon and its approval of a con-
stitution containing the initiative as providing a republi-
can form of government does not control this court in the
construction of the language of the Oregon constitution,
or in passing upon the validity of any provision or amend-
ment to that constitution. *Gunn* v. *Barry*, 12 Wall. 610;
*Homestead Cases*, 22 Gratt. 266; *Coyle* v. *Smith*, 221 U. S.
559; *McPherson* v. *Blacker*, 146 U. S. 1; *Texas* v. *White*,
7 Wall. 725.

The court has jurisdiction because the Oregon amend-
ment providing for the initiative and the "measure" in
question deny due process of law and the equal protection
of the law. *Davidson* v. *New Orleans*, 96 U. S. 97; *All-
geyer* v. *Louisiana*, 165 U. S. 578; *Southwestern Tel. &
Tel. Co.* v. *City of Dallas*, 134 S. W. Rep. 321; *Telephone
Co.* v. *Los Angeles*, 211 U. S. 280.

The power to impose taxes has in our Government
always been vested exclusively in the legislative depart-
ment. It is a political axiom that the taxing power must
be exercised by the legislative arm of the Government
or by its authority: *Meriwether* v. *Garrett*, 102 U. S. 472,
501; *Heine* v. *The Levee Commissioners*, 19 Wall. 655;
*Munday* v. *Rahway*, 43 N. J. L. 346; Cooley, Taxation, 32,
34; *Spencer* v. *Merchant*, 125 U. S. 345, 355.

The guarantee of equal protection of the law is a guarantee of the protection of equal laws. *Southern Railway Co.* v. *Greene*, 216 U. S. 412; *Yick Wo* v. *Hopkins*, 118 U. S. 369.

The unconstitutionality of the acts of a State are equally within the jurisdiction of the courts, whether they be the acts of the legislative or executive department or of the people themselves, adopting their constitutions or amending them. *Cohens* v. *Virginia*, 6 Wheat. 415; *Dodge* v. *Woolsey*, 18 How. 332; *Cummings* v. *Missouri*, 4 Wall. 277; Cooley, Const. Lim., 7th ed. 62; *Koehler* v. *Hill, supra.*

*Mr. John J. Dye* and *Mr. Addison C. Harris*, submitted a brief as *amici curiæ*, by leave of the court, in support of the contentions of the plaintiff in error.

*Mr. A. M. Crawford, Mr. George Fred Williams* and *Mr. Jackson H. Ralston*, with whom *Mr. S. H. Van Winkle, Mr. W. S. U'Ren* and *Mr. C. E. S. Wood* were on the brief, for defendant in error:

The power to determine whether a State has a republican form of government is vested in Congress. Hence it is a political rather than a judicial question. *Luther* v. *Borden*, 7 How. 1, 42; *Texas* v. *White*, 7 Wall. 700, 730; *Taylor* v. *Beckham*, 178 U. S. 548, 578; *Hopkins* v. *Duluth*, 81 Minnesota, 189; Article by W. A. Coutts, Vol. VI, No. 4, 304, Michigan Law Review; *In re Duncan*, 139 U. S. 449.

If the question is a judicial one, courts of the United States will follow the decision of the state courts, where the state court has passed upon the question. *Luther* v. *Borden*, 7 How. 1, 40; *Leeper* v. *State of Texas*, 139 U. S. 462–467.

The Federal authorities, including the Supreme Court, h ve treated this as a political question. 7 How. 1, 42; Cooley on Const. Lim., 7th ed., p. 59, 6th ed., p. 42.

This question does not lose its political complexion because it has arisen since the admission of Oregon into the Union of States.  If the courts take jurisdiction of these questions, then we have a decision upon a political question, decided by the political power, reëxamined by the judicial and perhaps overthrown.  One branch of the Government becomes arrayed against another, and revolution or rebellion is imminent.

It is not a decision upon one clause of the Constitution, but the whole instrument is examined and considered, and the plan or scheme of government there outlined adjudged to be republican, or anti-republican, in character.

The State of Oklahoma was recently admitted into the Union with the initiative and referendum principles reserved to the people.  See §§ 2, 3, 5, Oklahoma Constitution.

While a court may decide whether an amendment of a constitution has been adopted in the prescribed manner, and whether it denies any constitutional right, either as to property or person, it would be an invasion of the prerogatives of Congress should the court below undertake to decide whether the constitution of a new State seeking admission is republican in form, and to decide whether it should become a member of the Union.

If the court decides to retain jurisdiction: A state constitution should not be held to contravene the Federal Constitution unless the general scope and plan of government provided in the former is opposed to the general scope and plan of government required by the latter, to be maintained by the State.  The initiative and referendum amendment is essentially republican in form as guaranteed in the Federal Constitution, construed in the light of the following authorities: Cooley, Const. Lim., 7th ed., 59; *Id.*, 6th ed., 42, 45; Federalist, Hamilton ed., No. 39, p. 301; No. 43, p. 342; Oberholtzer on the Referen-

dum in America, Chap. 45, pp. 368 and 369; 2 Story, Const. 5th ed., §§ 1815 to 1819, both inclusive; 1 Elliott's Debates, 406; 5 *Id.* 160; 15 Writings of Thomas Jefferson, p. 17 (see Vol. XI, Federal Ed., p. 529); *Chisholm* v. *Georgia,* 2 Dallas, 419, 457; *In re Duncan,* 139 U. S. 449, 461; *Luther* v. *Borden,* 7 How. 42; *Minor* v. *Happersett,* 21 Wall. 162, 175; *Taylor* v. *Beckham,* 178 U. S. 548, 578; *Hopkins* v. *Duluth,* 81 Minnesota, 189; *People* v. *Sours,* 31 Colorado, 369, 383; *In re Andrew Pfahler,* 150 California, 71, 77, 78; *Ex parte Wagner,* 21 Oklahoma, 33, 36; *Kadderly* v. *Portland,* 44 Oregon, 118, 144; *Oregon* v. *Pac. States Tel. Co.,* 53 Oregon, 162; *Straw* v. *Harris,* 54 Oregon, 424, 431; *Kring* v. *Missouri,* 107 U. S. 221.

The members of the Federal convention considered a "republican form of government" to be a government which derived all its powers from the great body of the people.

Both the Federal and state courts have uniformly held that the initiative method of enacting laws was not repugnant to the provisions of § 4, Art. IV, of the Federal Constitution, either directly or by necessary inference. *Chisholm* v. *Georgia,* 2 Dall. 419, 457; *In re Duncan,* 139 U. S. 449, 461; *Minor* v. *Happersett,* 21 Wall. 162, 175; *Hopkins* v. *Duluth,* 81 Minnesota, 189; *People* v. *Sours,* 31 Colorado, 369, 383; *In re Andrew Pfahler,* 150 California, 71, 77, 78; *Kadderly* v. *Portland,* 44 Oregon, 118; 74 Pac. Rep. 710; *Oregon* v. *Pac. States T. & T. Co.,* 53 Oregon, 162; 99 Pac. Rep. 427; *Straw* v. *Harris,* 54 Oregon, 424, 431.

The executive and legislative branches of the Federal Government have held, in substance, that the reservation of the initiative and referendum powers by the people of a State is not violative of the Federal Constitution nor hostile to a republican form of government. Senators and representatives from States reserving those powers are seated in the Senate and House of Representatives without protest. When new States are admitted, the President and

Congress pass upon the form of government presented by the proposed State, and decide whether the same is in harmony with the Constitution of the United States, and they have in several cases approved state constitutions reserving the identical powers attacked in the case at bar, notably, Oklahoma and Arizona, and other States have changed their constitutions to include those powers, to-wit: South Dakota, Utah, Colorado, Arkansas, Maine and Oregon, without objection from any Federal authority, and no question has ever been raised as to their representation in Congress.

Also the right of the people to instruct their representatives in Congress and in the state legislatures, if it exists, is an admission or acknowledgment that the supreme power rests in the people, and we contend that such right does exist.

Inexpediency should not be considered. That is for the law-making power of the State.

The act does not violate any of the provisions of § 1 of the Fourteenth Amendment.

Assuming that the act under consideration was lawfully enacted the taxes levied thereby must be considered a valid exercise of the taxing power of the State in the light of the following authorities: *Southwestern Oil Co.* v. *Texas,* 217 U. S. 114; *Bell's Gap R. Co.* v. *Pennsylvania,* 134 U. S. 232, 237; *Home Ins. Co.* v. *New York,* 134 U. S. 594; *Connolly* v. *Union Sewer Pipe Co.,* 184 U. S. 540, 562; *Kentucky R. Tax Case,* 115 U. S. 321, 337; *Magoun* v. *Illinois Savings Bank,* 170 U. S. 283, 294; *Am. Sugar Ref. Co.* v. *Louisiana,* 179 U. S. 89; *Cargill Co.* v. *Minnesota,* 180 U. S. 452, 468; *Cook* v. *Marshall County,* 196 U. S. 261, 268, 273, 274; *Armour Packing Co.* v. *Lacy,* 200 U. S. 226, 235; *Delaware Railroad Tax Case,* 18 Wall. 206, 231; 2 Cooley on Taxation, 3d ed., 1095; *City of St. Joe* v. *Ernst,* 8 S. W. Rep. (Mo.) 558; *Producers Oil Co.* v. *Texas,* 99 S. W. Rep. (Tex.) 157; *State Tax on R. R. Gross Receipts,* 15 Wall. 284, 293.

It cannot be claimed in this case that a tax on gross earnings is even incidentally a tax on interstate commerce.

*Mr. George H. Shibley*, Director of the American Bureau of Political Research of People's Rule League of America; *Mr. Robert L. Owen*, United States Senator from Oklahoma, Chairman of the National Committee, People's Rule League of America, and *Mr. J. Henry Carnes* as counsel, for the State of Oregon, filed a brief for the defendant in error.

*Mr. George Fred Williams*, as counsel for the States of California, Arkansas, Colorado, South Dakota and Nebraska, filed a separate brief for defendant in error.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

We premise by saying that while the controversy which this record presents is of much importance, it is not novel. It is important, since it calls upon us to decide whether it is the duty of the courts or the province of Congress to determine when a State has ceased to be republican in form and to enforce the guarantee of the Constitution on that subject. It is not novel, as that question has long since been determined by this court conformably to the practise of the Government from the beginning to be political in character, and therefore not cognizable by the judicial power, but solely committed by the Constitution to the judgment of Congress.

The case is this: In 1902 Oregon amended its constitution (Art. IV, § 1). This amendment while retaining an existing clause vesting the exclusive legislative power in a General Assembly consisting of a senate and house of representatives added to that provision the following: "But the people reserve to themselves power to propose laws and amendments to the constitution and to enact or

reject the same at the polls, independent of the legislative assembly, and also reserve power at their own option to approve or reject at the polls any act of the legislative assembly." Specific means for the exercise of the power thus reserved was contained in further clauses authorizing both the amendment of the constitution and the enactment of laws to be accomplished by the method known as the initiative and that commonly referred to as the referendum. As to the first, the initiative, it suffices to say that a stated number of voters were given the right at any time to secure a submission to popular vote for approval of any matter which it was desired to have enacted into law, and providing that the proposition thus submitted when approved by popular vote should become the law of the State. The second, the referendum, provided for a reference to a popular vote, for approval or disapproval, of any law passed by the legislature, such reference to take place either as the result of the action of the legislature itself or of a petition filed for that purpose by a specified number of voters. The full text of the amendment is in the margin.[1]

---

[1] Section 1 of Article IV of the constitution of the State of Oregon shall be and hereby is amended to read as follows:

SECTION 1. The legislative authority of the state shall be vested in a legislative assembly, consisting of a senate and house of representatives, but the people reserve to themselves power to propose laws and amendments to the constitution and to enact or reject the same at the polls, independent of the legislative assembly, and also reserve power at their own option to approve or reject at the polls any act of the legislative assembly. The first power reserved by the people is the initiative, and not more than eight per cent of the legal voters shall be required to propose any measure by such petition, and every such petition shall include the full text of the measure so proposed. Initiative petitions shall be filed with the secretary of state not less than four months before the election at which they are to be voted upon. The second power is the referendum, and it may be ordered (except as to laws necessary for the immediate preservation of the public peace, health, or safety)

In 1903 (Feby. 24, 1903, Gen. Laws 1903, p. 244) detailed provisions for the carrying into effect of this amendment were enacted by the legislature.

By resort to the initiative in 1906 a law taxing certain classes of corporations was submitted, voted on and promulgated by the Governor in 1906 (June 25, 1906, Gen. Laws 1907, p. 7) as having been duly adopted. By this law telephone and telegraph companies were taxed, by what was qualified as an annual license, two per centum upon their gross revenue derived from business done within the State. Penalties were provided for non-payment, and methods were created for enforcing payment in case of delinquency.

The Pacific States Telephone and Telegraph Company, an Oregon corporation engaged in business in that State, made a return of its gross receipts as required by the

either by the petition signed by five per cent of the legal voters, or by the legislative assembly, as other bills are enacted. Referendum petitions shall be filed with the secretary of state not more than ninety days after the final adjournment of the session of the legislative assembly which passed the bill on which the referendum is demanded. The veto power of the governor shall not extend to measures referred to the people. All elections on measures referred to the people of the state shall be had at the biennial regular general elections, except when the legislative assembly shall order a special election. Any measure referred to the people shall take effect and become the law when it is approved by a majority of the votes cast thereon, and not otherwise. The style of all bills shall be: "Be it enacted by the people of the state of Oregon." This section shall not be construed to deprive any member of the legislative assembly of the right to introduce any measure. The whole number of votes cast for justice of the supreme court at the regular election last preceding the filing of any petition for the initiative or for the referendum shall be the basis on which the number of legal voters necessary to sign such petition shall be counted. Petitions and orders for the initiative and for the referendum shall be filed with the secretary of state, and in submitting the same to the people he, and all other officers, shall be guided by the general laws and the act submitting this amendment, until legislation shall be especially provided therefor. (1 Lord's Oregon Laws, p. 89.)

statute and was accordingly assessed two per cent. upon
the amount of such return. The suit which is now before
us was commenced by the State to enforce payment of
this assessment and the statutory penalties for delin-
quency. The petition alleged the passage of the taxing
law by resort to the initiative, the return made by the
corporation, the assessment, the duty to pay and the
failure to make such payment.

The answer of the corporation contained twenty-nine
paragraphs. Four of these challenged the validity of the
tax because of defects inhering in the nature or operation
of the tax. The defenses stated in these four paragraphs,
however, may be put out of view, as the defendant cor-
poration, on its own motion, was allowed by the court to
strike these propositions from its answer. We may also
put out of view the defenses raised by the remaining para-
graphs based upon the operation and effect of the state
constitution as they are concluded by the judgment of the
state court. Coming to consider these paragraphs of the
answer thus disembarrassed, it is true to say that they all,
in so far as they relied upon the Constitution of the United
States, rested exclusively upon an alleged infirmity of the
powers of government of the State begotten by the in-
corporation into the state constitution of the amendment
concerning the initiative and the referendum.

The answer was demurred to as stating no defense.
The demurrer was sustained, and the defendant electing
not to plead further, judgment went against it and that
judgment was affirmed by the Supreme Court of Oregon.
(53 Oregon, 162.) The court sustained the conclusion by
it reached, not only for the reasons expressed in its opinion,
but by reference to the opinion in a prior case (*Kadderly*
v. *Portland*, 44 Oregon, 118, 146), where a like contro-
versy had been determined.

The assignments of error filed on the allowance of the
writ of error are numerous. The entire matters covered

by each and all of them in the argument, however, are re-
duced to six propositions, which really amount to but one,
since they are all based upon the single contention that the
creation by a State of the power to legislate by the initia-
tive and referendum causes the prior lawful state govern-
ment to be bereft of its lawful character as the result of
the provisions of § 4 of Art. IV of the Constitution, that
"The United States shall guarantee to every State in this
Union a Republican Form of Government, and shall pro-
tect each of them against Invasion; and on Application
of the Legislature, or of the Executive (when the Legisla-
ture cannot be convened), against domestic Violence."
This being the basis of all the contentions, the case comes
to the single issue whether the enforcement of that pro-
vision, because of its political character, is exclusively
committed to Congress or is judicial in its character.
Because of their absolute unity we consider all the proposi-
tions together, and therefore at once copy them. We
observe, however, that in the argument the second, fourth
and fifth paragraphs, for the purposes of discussion, were
subordinately classified, and these subordinate classifica-
tions we omit from our text, reproducing them, however,
by a marginal reference.

## I.

"The initiative and the tax measure in question are
repugnant to the provisions of section 1 of the Fourteenth
Amendment to the Constitution of the United States
which forbids a State to deny to any person within its
jurisdiction the equal protection of the law.

## II.

"The initiative amendment and the tax in question,
levied pursuant to a measure, passed by authority of the
initiative amendment, violates the right to a republican

form of government which is guaranteed by section 4, article IV, of the Federal Constitution.[1]

## III.

"Taxation by the initiative method violates fundamental rights and is not in accordance with 'the law of the land.' (U. S. Const., Art. VI).

## IV.

"The initiative is in contravention of a republican form of government. Government by the people directly is the attribute of a pure democracy and is subversive of the principles upon which the republic is founded. Direct legislation is, therefore, repugnant to that form of government with which alone Congress could admit a State to the Union and which the State is bound to maintain.[2]

---

[1] 1. The guaranty of article IV, section 4, of the Federal Constitution is to the people of the States, and to each citizen, as well as to the States as political entities.

2. Section 4 of article IV therefore prohibits the majority in any State from adopting an unrepublican constitution.

[2] 1. Difference between a republic and democracy.

2. In ascertaining the meaning of the phrase "republican form of government" the debates of the constitutional conventions and the federalist papers are of great importance, if not conclusive.

3. The framers of the Constitution recognized the distinction between the republican and democratic form of government, and carefully avoided the latter.

4. The extent of territory of the States alone sufficed, in the judgment of the framers of the Constitution, to condemn the establishment of a democratic form of government.

5. The form of state government perpetuated by the Constitution was the republican form with the three departments of government, in force in all the States at the time of the adoption of the Constitution.

6. The history of other nations does not furnish the definition of the phrase "republican form of government" as those words were used by the framers of the Constitution. They distinguish the American from all other republics by the introduction of the principle of representation.

## V.

"The Federal Constitution presupposes in each State the maintenance of a republican form of government and the existence of state legislatures, to wit: Representative assemblies having the power to make the laws; and that in each State the powers of government will be divided into three departments: a legislature, an executive and a judiciary.  One of these, the legislature, is destroyed by the initiative.[1]

## VI.

" The provision in the Oregon constitution for direct legislation violates the provisions of the act of Congress admitting Oregon to the Union."

On the surface, the impression might be produced that the first and third propositions,—the one in words relating

7. Initiative legislation is invalid because government by the people directly is inconsistent with our form of government.

8. The well-known practices of (a) adopting state constitutions by popular vote, and of (b) local legislation in "town meetings," furnish no precedent for the lodgment of legislative power in the ballot-box.

[1] 1. State legislatures are a vital feature of our Government; the Federal Constitution presupposes their existence and imposes on each State the obligation to maintain them.

2. The division of powers of the three departments in each of the States is a prerequisite to the national Government.

3. It is evident under the Constitution the State Legislatures are the agency to carry on the relations between the Nation and the States.

4. The word "legislature" in the Constitution means a representative assembly consisting of two houses, empowered to make the law.  Such was its meaning at the time of the adoption of the Constitution.

5. Contemporaneous legislation by Congress sheds some light on the meaning of the term "legislature" as used in the constitution.

6. The initiative destroys the legislative assemblies or legislatures which it is the implied obligation of each State to maintain, for a legislature must be the law-making power.

7. The initiative overthrows one of the greatest safeguards against the abuse of the power of legislation, to wit: the system of a dual legislative assembly.

to the equal protection clause of the Fourteenth Amendment, and the other in terms asserting "taxation by the initiative method violates fundamental rights, and is not in accordance with the law of the land," are addressed to some inherent defect in the tax or infirmity of power to levy it without regard to the guarantee of a republican form of Government. But this is merely superficial, and is at once dispelled by observing that every reason urged to support the two propositions is solely based on § 4 of Art. IV and the consequent inability of the State to impose any tax of any kind which would not violate the Fourteenth Amendment or be repugnant to the law of the land if in such State the initiative or referendum method is permitted. Thus dispelling any mere confusion resulting from forms of expression and considering the substance of things, it is apparent that the second proposition, which rests upon the affirmative assertion that by the adoption of the initiative and referendum the State "violates the right to a republican form of government which is guaranteed by section 4 of Article IV of the Federal Constitution," and the two subdivisions made of that proposition, the first that "the guarantee in question is to the people of the States and to each citizen, as well as to the States as political entities," and the second asserting "section 4 of Article IV therefore prohibits the majority in any State from adopting an unrepublican constitution," are the basic propositions upon which all the others rest. That is to say, all the others and their subdivisions are but inducements tending to show the correctness of the second and fundamental one. This conclusion is certain, as they all but point out the various modes by which the adoption of the initiative and referendum incapacitated the State from performing the duties incumbent upon it as a member of the Union or its obligations towards its citizens, thus causing the State to cease to be a government republican in form within the intendment of the

constitutional provision relied upon. In other words, the propositions each and all proceed alone upon the theory that the adoption of the initiative and referendum destroyed all government republican in form in Oregon. This being so, the contention, if held to be sound, would necessarily affect the validity, not only of the particular statute which is before us, but of every other statute passed in Oregon since the adoption of the initiative and referendum. And indeed the propositions go further than this, since in their essence they assert that there is no governmental function, legislative or judicial, in Oregon, because it cannot be assumed, if the proposition be well founded, that there is at one and the same time one and the same government which is republican in form and not of that character.

Before immediately considering the text of § 4 of Art. IV, in order to uncover and give emphasis to the anomalous and destructive effects upon both the state and national governments which the adoption of the proposition implies, as illustrated by what we have just said, let us briefly fix the inconceivable expansion of the judicial power and the ruinous destruction of legislative authority in matters purely political which would necessarily be occasioned by giving sanction to the doctrine which underlies and would be necessarily involved in sustaining the propositions contended for. First. That however perfect and absolute may be the establishment and dominion in fact of a state government, however complete may be its participation in and enjoyment of all its powers and rights as a member of the national Government, and however all the departments of that Government may recognize such state government, nevertheless every citizen of such State or person subject to taxation therein, or owing any duty to the established government, may be heard, for the purpose of defeating the payment of such taxes or avoiding the discharge of such duty, to assail in a court of justice the rightful exist-

ence of the State. Second. As a result, it becomes the duty of the courts of the United States, where such a claim is made, to examine as a justiciable issue the contention as to the illegal existence of a State and if such contention be thought well founded to disregard the existence in fact of the State, of its recognition by all of the departments of the Federal Government, and practically award a decree absolving from all obligation to contribute to the support of or obey the laws of such established state government. And as a consequence of the existence of such judicial authority a power in the judiciary must be implied, unless it be that anarchy is to ensue, to build by judicial action upon the ruins of the previously established government a new one, a right which by its very terms also implies the power to control the legislative department of the Government of the United States in the recognition of such new government and the admission of representatives therefrom, as well as to strip the executive department of that government of its otherwise lawful and discretionary authority.

Do the provisions of § 4, Art. IV, bring about these strange, far-reaching and injurious results? That is to say, do the provisions of that Article obliterate the division between judicial authority and legislative power upon which the Constitution rests? In other words, do they authorize the judiciary to substitute its judgment as to a matter purely political for the judgment of Congress on a subject committed to it and thus overthrow the Constitution upon the ground that thereby the guarantee to the States of a government republican in form may be secured, a conception which after all rests upon the assumption that the States are to be guaranteed a government republican in form by destroying the very existence of a government republican in form in the Nation.

We shall not stop to consider the text to point out how absolutely barren it is of support for the contentions sought to be based upon it, since the repugnancy of those con-

tentions to the letter and spirit of that text is so conclusively established by prior decisions of this court as to cause the matter to be absolutely foreclosed.

In view of the importance of the subject, the apparent misapprehension on one side and seeming misconception on the other suggested by the argument as to the full significance of the previous doctrine, we do not content ourselves with a mere citation of the cases, but state more at length than we otherwise would the issues and the doctrine expounded in the leading and absolutely controlling case—*Luther* v. *Borden,* 7 How. 1.

The case came from a Circuit Court of the United States. It was an action of damages for trespass. The case grew out of what is commonly known as the Dorr Rebellion in Rhode Island and the conflict which was brought about by the effort of the adherents of that alleged government sometimes described as "the government established by a voluntary convention" to overthrow the established charter government. The defendants justified on the ground that the acts done by them charged as a trespass were done under the authority of the charter government during the prevalence of martial law and for the purpose of aiding in the suppression of an armed revolt by the supporters of the insurrectionary government. The plaintiffs, on the contrary, asserted the validity of the voluntary government and denied the legality of the charter government. In the course of the trial the plaintiffs to support the contention of the illegality of the charter government and the legality of the voluntary government "although that government never was able to exercise any authority in the State nor to command obedience to its laws or to its officers," offered certain evidence tending to show that nevertheless it was "the lawful and established government," upon the ground that its powers to govern have been ratified by a large majority of the male people of the State of the age of 21 years and upwards and also by a large

majority of those who were entitled to vote for general
officers cast in favor of a constitution" which was sub-
mitted as the result of a voluntarily assembled convention
of what was alleged to be the people of the State of Rhode
Island. The Circuit Court rejected this evidence and in-
structed the jury that as the charter government was the
established state government at the time the trespass oc-
curred, the defendants were justified in acting under the
authority of that government. This court, coming to
review this ruling, at the outset pointed out "the novelty
and serious nature" of the question which it was called
upon to decide. Attention also was at the inception di-
rected to the far-reaching effect and gravity of the con-
sequences which would be produced by sustaining the
right of the plaintiff to assail and set aside the established
government by recovering damages from the defendants
for acts done by them under the authority of and for the
purpose of sustaining such established government. On
this subject it was said (p. 38):

"For, if this court is authorized to enter upon this
inquiry as proposed by the plaintiff, and it should be de-
cided that the charter government had no legal existence
during the period of time above mentioned, if it had been
annulled by the adoption of the opposing government,
then the laws passed by its legislature during that time,
were nullities; its taxes wrongfully collected; its salaries
and compensation to its officers illegally paid; its public
accounts improperly settled; and the judgments and sen-
tences of its courts in civil and criminal cases null and void,
and the officers who carried their decisions into operation,
answerable as trespassers, if not in some cases as crim-
inals."

Coming to review the question, attention was directed
to the fact that the courts of Rhode Island had recognized
the complete dominancy in fact of the charter govern-
ment, and had refused to investigate the legality of the

voluntary government for the purpose of decreeing the established government to be illegal, on the ground (p. 39) "that the inquiry proposed to be made belonged to the political power and not to the judicial; that it rested with the political power to decide whether the charter government had been displaced or not; and when that decision was made, the judicial department would be bound to take notice of it as the paramount law of the State, without the aid of oral evidence or the examination of witnesses, etc." It was further remarked:

"This doctrine is clearly and forcibly stated in the opinion of the supreme court of the State in the trial of Thomas W. Dorr, who was the governor elected under the opposing constitution, and headed the armed force which endeavored to maintain its authority."

Reviewing the grounds upon which these doctrines proceeded, their cogency was pointed out and the disastrous effect of any other view was emphasized, and from a point of view of the state law the conclusive effect of the judgments of the courts of Rhode Island was referred to. The court then came to consider the correctness of the principle applied by the Rhode Island courts, in the light of § 4 of Art. IV, of the Constitution of the United States. The contention of the plaintiff in error concerning that Article was, in substantial effect, thus pressed in argument: The ultimate power of sovereignty is in the people, and they in the nature of things, if the government is a free one, must have a right to change their constitution. Where in the ordinary course no other means exists of doing so, that right of necessity embraces the power to resort to revolution. As, however, no such right it was urged could exist under the Constitution, because of the provision of § 4 of Art. IV, protecting each State on application of the legislature or of the executive, when the legislature cannot be convened, against domestic violence, it followed that the guarantee of a government republican in form

VOL. CCXXIII—10

was the means provided by the Constitution to secure the people in their right to change their government, and made the question whether such change was rightfully accomplished a judicial question determinable by the courts of the United States. To make the physical power of the United States available, at the demand of an existing state government, to suppress all resistance to its authority, and yet to afford no method of testing the rightful character of the state government, would be to render people of a particular State hopeless in case of a wrongful government. It was pointed out in the argument that the decision of the courts of Rhode Island in favor of the charter government illustrated the force of these contentions, since they proceeded solely on the established character of that government and not upon whether the people had rightfully overthrown it by voluntarily drawing and submitting for approval a new constitution. It is thus seen that the propositions relied upon in this case were presented for decision in the most complete and most direct way. The court, in disposing of them, while virtually recognizing the cogency of the argument in so far as it emphasized the restraint upon armed resistance to an existing state government, arising from the provision of § 4 of Art. IV, and the resultant necessity for the existence somewhere in the Constitution of a tribunal, upon which the people of a State could rely, to protect them from the wrongful continuance against their will of a government not republican in form, proceeded to inquire whether a tribunal existed and its character. In doing this it pointed out that owing to the inherent political character of such a question its decision was not by the Constitution vested in the judicial department of the Government, but was on the contrary exclusively committed to the legislative department by whose action on such subject the judiciary were absolutely controlled. The court said (p. 42):

"Moreover, the constitution of the United States, as far as it has provided for an emergency of this kind, and authorized the general government to interfere in the domestic concerns of a State, has treated the subject as political in its nature, and placed the power in the hands of that department.

"The fourth section of the fourth article of the constitution of the United States provides that the United States shall guarantee to every State in the Union a republican form of government, and shall protect each of them against invasion; and on the application of the legislature or of the executive (when the legislature cannot be convened) against domestic violence.

"Under this article of the constitution it rests with congress to decide what government is the established one in a State. For, as the United States guarantee to each State a republican government, congress must necessarily decide what government is established in the State before it can determine whether it is republican or not. And when the senators and representatives of a State are admitted into the councils of the Union, the authority of the government under which they are appointed, as well as its republican character, is recognized by the proper constitutional authority. And its decision is binding on every other department of the government, and could not be questioned in a judicial tribunal. It is true that the contest in this case did not last long enough to bring the matter to this issue; and as no senators or representatives were elected under the authority of the government of which Mr. Dorr was the head, Congress was not called upon to decide the controversy. Yet the right to decide is placed there, and not in the courts."

Pointing out that Congress, by the act of February 28, 1795 (1 Stat. 424, c. 36), had recognized the obligation resting upon it to protect from domestic violence by conferring authority upon the President of the United States,

on the application of the legislature of a State or of the Governor, to call out the militia of any other State or States to suppress such insurrection, it was suggested that if the question of what was the rightful government within the intendment of § 4 of Art. IV was a judicial one, the duty to afford protection from invasion and to suppress domestic violence would be also judicial, since those duties were inseparably related to the determination of whether there was a rightful government. If this view were correct, it was intimated, it would follow that the delegation of authority made to the President by the act of 1795 would be void as a usurpation of judicial authority, and hence it would be the duty of the courts, if they differed with the judgment of the President as to the manner of discharging this great responsibility, to interfere and set at naught his action; and the pertinent statement was made (p. 43): "If the judicial power extends so far, the guarantee contained in the constitution of the United States is a guarantee of anarchy, and not of order."

The fundamental doctrines thus so lucidly and cogently announced by the court, speaking through Mr. Chief Justice Taney in the case which we have thus reviewed, have never been doubted or questioned since; and have afforded the light guiding the orderly development of our constitutional system from the day of the deliverance of that decision up to the present time. We do not stop to cite other cases which indirectly or incidentally refer to the subject, but conclude by directing attention to the statement by the court, speaking through Mr. Chief Justice Fuller, in *Taylor* v. *Beckham, No. 1*, 178 U. S. 548, where, after disposing of a contention made concerning the Fourteenth Amendment and coming to consider a proposition which was necessary to be decided concerning the nature and effect of the guarantee of § 4 of Art. IV, it was said (p. 578):

"But it is said that the Fourteenth Amendment must be

read with section 4 of article IV of the Constitution, providing that: 'The United States shall guarantee to every State in this Union a republican form of government, and shall protect each of them against invasion; and on application of the legislature, or of the executive (when the legislature cannot be convened), against domestic violence.' It is argued that when the State of Kentucky entered the Union, the people 'surrendered their right of forcible revolution in state affairs,' and received in lieu thereof a distinct pledge to the people of the State of the guarantee of a republican form of government, and of protection against invasion, and against domestic violence; that the distinguishing feature of that form of government is the right of the people to choose their own officers for governmental administration; that this was denied by the action of the General Assembly in this instance; and, in effect, that this court has jurisdiction to enforce that guarantee, albeit the judiciary of Kentucky was unable to do so because of the division of the powers of government. And yet the writ before us was granted under § 709 of the Revised Statutes to revise the judgment of the state court on the ground that a constitutional right was decided against by that court.

"It was long ago settled that the enforcement of this guarantee belonged to the political department. *Luther* v. *Borden*, 7 How. 1. In that case it was held that the question, which of the two opposing governments of Rhode Island, namely, the charter government or the government established by a voluntary convention, was the legitimate one, was a question for the determination of the political department; and when that department had decided, the courts were bound to take notice of the decision and follow it. . . ."

It is indeed a singular misconception of the nature and character of our constitutional system of government to suggest that the settled distinction which the doctrine just

stated points out between judicial authority over justiciable controversies and legislative power as to purely political questions tends to destroy the duty of the judiciary in proper cases to enforce the Constitution. The suggestion but results from failing to distinguish between things which are widely different, that is, the legislative duty to determine the political questions involved in deciding whether a state government republican in form exists, and the judicial power and ever-present duty whenever it becomes necessary in a controversy properly submitted to enforce and uphold the applicable provisions of the Constitution as to each and every exercise of governmental power.

How better can the broad lines which distinguish these two subjects be pointed out than by considering the character of the defense in this very case? The defendant company does not contend here that it could not have been required to pay a license tax. It does not assert that it was denied an opportunity to be heard as to the amount for which it was taxed, or that there was anything inhering in the tax or involved intrinsically in the law which violated any of its constitutional rights. If such questions had been raised they would have been justiciable, and therefore would have required the calling into operation of judicial power. Instead, however, of doing any of these things, the attack on the statute here made is of a wholly different character. Its essentially political nature is at once made manifest by understanding that the assault which the contention here advanced makes it not on the tax as a tax, but on the State as a State. It is addressed to the framework and political character of the government by which the statute levying the tax was passed. It is the government, the political entity, which (reducing the case to its essence) is called to the bar of this court, not for the purpose of testing judicially some exercise of power assailed, on the ground that its exertion has injuriously

affected the rights of an individual because of repugnancy to some constitutional limitation, but to demand of the State that it establish its right to exist as a State, republican in form.

As the issues presented, in their very essence, are, and have long since by this court been, definitely determined to be political and governmental, and embraced within the scope of the powers conferred upon Congress, and not therefore within the reach of judicial power, it follows that the case presented is not within our jurisdiction, and the writ of error must therefore be, and it is, dismissed for want of jurisdiction.

*Dismissed for want of jurisdiction.*