GORSUCH, Circuit Judge,
dissenting from the denial of rehearing en banc.
Everyone knows that before a federal court may decide a dispute “judicially manageable standards” must exist for doing so. Federal judges aren’t free to intervene in any old dispute and rule any way they wish. Legislatures may act in ways that are “inconsistent, illogical, and ad hoc.” Vieth v. Jubelirer, 541 U.S. 267, 278, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004) (plurality opinion). But the “judicial Power” extended by Article III, § 1 to the federal courts imposes on us the duty to act “in the manner traditional for English and American courts.” Id. And “[o]ne of the most obvious limitations imposed by that requirement is that judicial action must be governed by standard, by rule ” — or, put differently, federal courts must be able to proceed in a “principled, rational, and ... reasoned” fashion. Id. Unless judicially manageable standards for decision exist, we have no business intervening. Id.; see also Zivotofsky v. Clinton, — U.S.-, 132 S.Ct. 1421, 182 L.Ed.2d 423 (2012).
Where are the judicially manageable standards for deciding this case? The burden of showing such standards exist usually presents a plaintiff with little trouble. Most cases in federal court — whether arising under congressional legislation or the common law or sounding in equity— come with ample principles and precedents for us to apply in a reasoned way, even if *1194 those principles and precedents don’t always dictate a single right answer. But in our case the plaintiffs make a rather novel claim: they contend that Colorado’s government is not a republican one — and so violates the Guarantee Clause — because tax increases proposed by the legislature must also be approved by the public. Where are the legal principles for deciding a claim like that?
The plaintiffs don’t say. They don’t suggest, for example, that the Clause requires all decisions about legislation to be made by elected representatives rather than the public. Neither do they contend that the Clause is offended only when all legislative decisions are made by direct democracy. If the Constitution could be said to contain one or the other of these rules — either forbidding any experiment with direct democracy or forbidding only the total loss of a representative legislature — we might have a principled basis for deciding the case. The former rule of decision might require judgment for the plaintiffs; the latter, for the defendants. But the plaintiffs in our case disclaim either such standard. They seem to acknowledge that some direct democracy is consistent with republican government, insisting only and instead that the kind here runs afoul of the Constitution.
And this is where we run into trouble. To date, the plaintiffs have declined to advance any test for determining when a state constitutional provision requiring direct democracy on one subject (here, taxes) does or doesn’t offend the Clause. No doubt, the task the plaintiffs face is a formidable one: they enter a field in which the Supreme Court has already dismissed for lack of judicially manageable standards a case challenging a state constitutional provision that allowed citizens to overturn by direct vote any state legislative enactment (not just enactments raising taxes). See Pac. States Tel. & Tel. Co. v. Oregon, 223 U.S. 118, 32 S.Ct. 224, 56 L.Ed. 377 (1912). The plaintiffs enter a field, too, where the Supreme Court has more recently chosen to derive a multi-part justici-ability test from its preexisting Guarantee Clause jurisprudence — in the process expressly reaffirming the idea that the Clause lacks judicially manageable standards for cases like ours. See Baker v. Carr, 369 U.S. 186, 223, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (noting that the Court has “refused to resort to the Guaranty Clause ... as the source of a constitutional standard for invalidating state action” in many cases, including one involving the “claim that initiative and referendum negated republican government”).
But even if the plaintiffs could somehow surmount these precedential problems and colorably contend that judicially manageable standards exist for deciding their case, they haven’t even tried. Three years of litigation have slipped by. During that time the parties have exhausted no fewer than three rounds of pleadings in the district court and an interlocutory appeal in this one. At every stage Governor Hick-enlooper has challenged the plaintiffs to identify judicially manageable standards of decision that might empower an Article III court to decide their case. Yet even today the plaintiffs profess no more than “confi-den[ce]” that if their case is allowed to proceed still further the district court will someday be able to find some standard for decision. Appellees’ Br. 28. For their part, the district court and the panel have allowed the case to proceed on this same sanguine hope — all while following the plaintiffs’ lead and conspicuously declining to identify any principled standard for decision. See Panel Op. 39-42; App. at 449 (district court opinion).[1]
*1195 In one sense, this shortcoming may be unimportant. On remand, after all, the district court remains very likely to dismiss this case — eventually—either for lack of manageable standards or on the merits. The plaintiffs’ failure for so long to identify any legal standards for deciding their own case pretty strongly suggests there aren’t any — or that what standards the Guarantee Clause may contain won’t prove favorable to them. Indeed, this hypothesis is fully borne out by the scholarly literature on the Clause’s text and original meaning. Much of which suggests that the Clause may rule out a state monarchy, a smaller amount of which suggests the Clause may rule out a complete direct democracy, but none of which credibly suggests a limited dose of direct democracy of the sort at issue here is constitutionally problematic.[2] Indeed, to hold for plaintiffs in this case would require a court to entertain the fantasy that more than half the states (27 in all) lack a republican government. See Appellant’s Br. 8.
Even so, it’s hard to look away — to ignore the failure of the plaintiffs, the district court, or the panel to identify any standard for decision — and conclude nothing of significance has happened here. The Supreme Court has plainly instructed that “[w]hen a court is given no standard by which to adjudicate a dispute ... resolution of the suit is beyond the judicial role envisioned by Article III.” Zivotofsky, 132 S.Ct. at 1432. Yet three years into this case and many challenges later and still no one has ventured any standard for deciding this dispute. It would seem time— past time — to say the plaintiffs have not carried their burden of establishing that this case lies within our power to decide under Article III. After all, this isn’t some prosaic question of fact that can be resolved by deposing a legislator-plaintiff or sending an interrogatory to the Governor: no amount of fact discovery can remedy the plaintiffs’ shortcomings in this case. We face an Article III issue and a question of law, one the plaintiffs bear the burden of answering but one they have not borne.
As things stand, the panel opinion assigns the litigants and the district court to a kind of litigation limbo — the promise of many more years wrestling with this case all without a wisp of an idea what rule of law might govern its disposition. That seems no small wrong to impose on any litigant in any case, but it is perhaps an especially unseemly wrong to impose on the state’s highest elected official in a case calling into question a state constitutional amendment. Federalism and comity ap *1196 pear to count for little when we condemn a state, its governor, and its constitution to a multi-year scavenger hunt up and down the federal court system looking for some judicially manageable standard that might permit us to entertain the case in the first place.
The situation we confront in this case is more than a little reminiscent of the one the Supreme Court faced in Vieth, where the plaintiffs sought to challenge a political gerrymander as unconstitutional. There, 18 years of experimenting by various courts failed to yield any sure standards for litigating those sorts of cases. Here, we encounter an arguably longer history of failed efforts to develop standards for litigating Guarantee Clause cases involving individual citizen initiatives — one extending into the nineteenth century. There, the plaintiffs sought to identify and defend as workable their own set of legal standards at the motion to dismiss stage, but the Court found those efforts unavailing and affirmed the dismissal of the complaint. Here, the plaintiffs haven’t even attempted to identify workable legal standards for adjudicating their case despite many opportunities over many years. If the law’s promise of treating like cases alike is to mean something, this case should be put to bed now as Vieth’s was then, rather than being destined to drag on forlornly to the same inevitable end. I respectfully dissent.

. In expressing confidence that judicially manageable standards might yet pop up, the panel opinion leaned primarily on the argu *1195 ment that because manageable standards were found in the Second Amendment to decide District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), manageable standards are sure to be found in the Guarantee Clause to decide this case. See Panel Op. 40-41. But that, of course, commits the logical fallacy of overgeneralization. Just because one clause of the Constitution contains manageable standards to decide one case doesn't mean another clause contains manageable standards for deciding another case. See, e.g., Vieth, 541 U.S. at 281, 124 S.Ct. 1769; id. at 313, 124 S.Ct. 1769 (dismissing political gerrymandering challenge because plaintiffs failed to carry their burden of showing judicially manageable standards existed for deciding it).

. See, e.g., Robert G. Natelson, A Republic, Not a Democracy? Initiative, Referendum, and the Constitution’s Guarantee Clause, 80 Tex. L.Rev. 807, 811 n. 19 (2002); G. Edward White, Reading the Guarantee Clause, 65 U. Colo. L.Rev. 787, 803-06 (1994); Akhil Reed Amar, The Central Meaning of Republican Government: Popular Sovereignty, Majority Rule, and the Denominator Problem, 65 U. Colo. L.Rev. 749, 749-52, 761-73 (1994); Jonathan Toren, Protecting Republican Government from Itself: The Guarantee Clause of Article IV, Section 4, 2 N.Y.U. J.L. & Liberty 371, 374-92, 392-99 (2007); Brief for Amici Independence Institute and Cato Institute 12-26.