Robert L. SCHULZ and John Salavador, Jr., Plaintiffs,

v.

THE NEW YORK STATE EXECUTIVE, George PATAKI, Governor; Michael Finnegan, Chief Counsel to the Governor, and Gary Sheffer, Spokesman for the Governor; The New York State Legislature, Sheldon Silver, Speaker of the Assembly, and Joseph Bruno, Majority Leader of the Senate; The New York State Unified Court System, Judith Kaye, Chief Judge; The New York State Board of Elections, Carol Berman, Chairman, Thomas Wilkey, Executive Director; and The New York State Board of Canvassers, Carol Berman, Chairman, Defendants.

No. 96–CV–1595.

United States District Court, N.D. New York.

April 14, 1997.

Robert L. Schulz, Queensbury, NY, pro se.

John Salvador, Jr., Lake George, NY, pro se.

Dennis C. Vacco, Attorney General, Albany, NY, for Defendants Pataki, State Legislature, and Unified Court System; Darren O'Connor, of counsel.

Cravath, Swaine & Moore, New York City, for Defendants Finnegan and Sheffer; Frederick A.O. Schwarz, of counsel.

## MEMORANDUM-DECISION and ORDER

McAVOY, Chief Judge.

## I. BACKGROUND

The present dispute concerns no less than twelve causes of action challenging, inter alia, the constitutionality of New York's Clean Water/Clean Air Bond Act; New York's Farm Preservation Act; section 123–b of New York's Finance Law; New York's procedure for choosing delegates to its constitutional conventions; and a number of the New York State Legislature's "Member Items." Defendants include the Governor of New York, the Governor's advisors, the New York State Legislature, key legislators, the New York Unified Court System, and the New York State Board of Elections. Plaintiffs Robert Schulz and John Salvador, although appearing *pro se*, are frequent litigators in federal and state court.

Not surprisingly, this case has a long and convoluted history. Plaintiffs' initial foray began on September 19, 1996, in Albany County Supreme Court, and continued to the Appellate Division, Third Department, where

Plaintiffs' request for a temporary restraining order, barring defendants Pataki, Finnegan, and Sheffer from advocating in favor of the Clean Water/Clean Air Bond Act, was rejected. *See Schulz v. New York State Executive,* Index No. 5852–96 (Alb.Cty.Sup.Ct.1996). On October 16, 1996, Plaintiffs discontinued their first state court action and commenced a second state court action seeking similar relief; on October 25, 1996, Justice Teresi denied Plaintiffs' second application for preliminary relief. *See Schulz v. New York State Executive,* Index No. 6353–96 (Alb.Cty.Sup.Ct.1996).

Not content to fight this battle on merely one front, Plaintiffs hurried to federal court on October 13, 1996, seeking (1) a declaration that certain actions by the defendants violated the New York State and the United States Constitutions, and (2) for a temporary restraining order or preliminary injunction enjoining the New York Legislature and Executive from implementing Chapters 412 and 413 of the Laws of 1996 (the "Clean Water/Clean Air Bond Act" hereinafter "Environmental Bond Act").

On October 17, 1996, this Court denied Plaintiffs' application for temporary relief and denied Plaintiffs' attempt to have their motion heard on an expedited basis. *See* Memorandum–Decision & Order dated October 18, 1996. On October 23, 1996, while the present matter was pending before this Court, Plaintiffs requested for the second time, and were denied, a Temporary Restraining Order in their state court action. Finally, on November 1, 1996, Justice Harris dismissed Plaintiffs' state action in its entirety. *See Schulz v. New York State Executive,* Index No. 6353–96 (Alb.Cty.Sup.Ct.1996).

**A. The Claims**

Although Plaintiffs are concerned with their government's profligate spending, they appear to be less concerned with, or simply incognizant of, the costs associated with their litigating these issues before nine federal and state court judges.

Plaintiffs' Complaint contains both federal and state law causes of action. Although the Complaint is a model of obfuscation, it appears that Plaintiffs are attempting to implicate four provisions in the United States Constitution: the Constitution's guarantee of a "Republican Form of Government," *see* Article IV section 4; the "privileges and immunities" clause of the Fourteenth Amendment; the "equal protection" clause of the Fourteenth Amendment; and the First Amendment.

The gravamen of Plaintiffs' state law claims is that the Environmental Bond Act violates the New York State Constitution because the debt it authorizes is not for a "single work or purpose," and its purposes are not "distinctly specified therein." N.Y. CONST. art. VII, § 11. Plaintiffs also assert that defendants Pataki, Finnegan, and Sheffer violated the New York State Constitution by using public funds and public credit to "exhort the electorate to vote 'yes' on the Bond Act." (Pltfs' Hem. of Law at 44.)

Presently before the Court are Defendants' Motions to Dismiss.

**II. DISCUSSION**

▮ Initially, it is appropriate to identify certain basic principles that limit the power of every federal court. Unlike their state counterparts, federal courts are not courts of general jurisdiction; "they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 540, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986); *see also Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 173–180, 2 L.Ed. 60 (1803). For example, prior to 1875, *see* Act of March 3, 1875, c. 137, 18 Stat. 470, federal courts did not even have original jurisdiction over actions that arose under the Constitution or laws of the United States. *See, e.g., Hague v. Committee for Indus. Organization,* 307 U.S. 496, 507, 59 S.Ct. 954, 960, 83 L.Ed. 1423 (1939). As Chief Justice Ellsworth succinctly noted in 1799:

> Will it be affirmed, that in every case, to which the judicial power of the United States extends, the federal courts may exercise a jurisdiction, without the intervention of the legislature, to distribute and regulate the power? The notion has fre-

quently been entertained, that the federal courts derive their judicial power immediately from the constitution; but the political truth is that the disposal of the judicial power (except in a few specified instances) belongs to congress. If congress has given the power to this court, we possess it, not otherwise: and if congress has not given the power to us, or to any other court, it still remains at the legislative disposal. Besides, congress is not bound, and it would, perhaps, be inexpedient, to enlarge the jurisdiction of the federal courts, to every subject, in every form, which the constitution might warrant.

*Turner v. Bank of North America,* 4 U.S. (4 Dall.) 8, 8, 1 L.Ed. 718 (1799).

Although there.is no consensus as to the framers' intent in creating federal courts of limited jurisdiction, early cases point to a fear of an all powerful federal sovereign. *See, e.g., Turner v. Bank of North America,* 4 U.S.(4 Dall.) 8, 8, 1 L.Ed. 718 (1799) ("Congress knew that the English courts have amplified their jurisdiction through the medium of legal fictions; and it was readily foreseen, that by the means of a colorable assignment to an alien, or to the citizen of another state, every controversy arising upon negotiable paper might be drawn into the federal courts."). Indeed, federalism concerns are plainly implicated in more recent cases as well. In *Healy v. Ratta,* 292 U.S. 263, 54 S.Ct. 700, 78 L.Ed. 1248 (1934), the Supreme Court stated:

> The power reserved to the states, under the Constitution, to provide for the determination of controversies in their courts, may be restricted only by the action of Congress in conformity to the judiciary sections of the Constitution. Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which (a federal) statute has defined.

*Healy,* 292 U.S. at 270, 54 S.Ct. at 703 (citations omitted); *see also Romero v. Int'l Terminal Operating Co.,* 358 U.S. 354, 379–380, 408, 79 S.Ct. 468, 483–484, 498–499, 3 L.Ed.2d 368 (1959) (Brennan, J., dissenting and concurring).

 Consequently, subject-matter jurisdiction is both an Article III as well as a statutory requirement. Certain legal consequences necessarily follow from this observation. For example, no action of the parties can confer subject-matter jurisdiction upon a federal court. Thus, the consent of the parties is irrelevant, *see California v. LaRue,* 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972), principles of estoppel do not apply, *see American Fire & Casualty Co. v. Finn,* 341 U.S. 6, 17–18, 71 S.Ct. 534, 541–542, 95 L.Ed. 702 (1951), and a party does not waive the defense by failing to challenge jurisdiction early in the proceedings. *See Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982); *Turner,* 4 U.S. (4 Dall.) at 8 ("Silence, inadvertence of consent cannot give jurisdiction, where the law denies it."). Similarly, a court, including an appellate court, must raise lack of subject-matter jurisdiction on its own motion. "[T]he rule, springing from the nature and limits of the judicial power of the United States is inflexible and without exception, which requires this court, of its own motion, to deny its jurisdiction, and, in the exercise of its appellate power, that of all other courts of the United States, in all cases where such jurisdiction does not affirmatively appear in the record." *Mansfield, C. & L.M.R. Co. v. Swan,* 111 U.S. 379, 382, 4 S.Ct. 510, 511, 28 L.Ed. 462 (1884).

 Accordingly, a federal district court cannot adjudicate every allegation of injustice, no matter how emphatically a party may argue to the contrary. Moreover, absent a viable basis of federal jurisdiction, a federal court is precluded from entertaining purely state law causes of action. Although under 28 U.S.C. § 1367(a) district courts have "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution," a district court cannot exercise supplemental jurisdiction unless there is first a proper basis for original federal jurisdic-

tion. *See, e.g., In re Joint Eastern and Southern Dist. Asbestos Litig.*, 14 F.3d 726, 730 n. 2 (2d Cir.1993) ("the court may not exercise supplemental jurisdiction over claims unless the court has 'original jurisdiction' over at least one of the plaintiff's claims"); *Cushing v. Moore*, 970 F.2d 1103, 1106 (2d Cir.1992).

Here, Defendants assert that this Court lacks subject matter jurisdiction to entertain Plaintiffs' claims and that in the alternative, Plaintiffs' claims should be dismissed because they are without merit. "While distinguishing between a dismissal for lack of subject matter jurisdiction under Rule 12(b)(1) and a dismissal for failure to state a claim under Rule 12(b)(6) appears straightforward in theory, it is often much more difficult in practice." *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir.1996).

Not surprisingly, jurists have long struggled with the difficulty of distinguishing, in federal question cases, between dismissal for lack of subject matter jurisdiction and dismissal on the merits. Justice Holmes described the differences in a federal question case in *The Fair v. Kohler Die and Specialty Co.*, 228 U.S. 22, 33 S.Ct. 410, 57 L.Ed. 716 (1913):

> [I]f it should appear that the plaintiff was not really relying upon [a federal statute] for his alleged rights, or if the claim of right were frivolous, the case might be dismissed. In the former instance the suit would not really and substantially involve a controversy within the jurisdiction of the court, and in the latter the jurisdiction would not be denied, except possibly in form.

228 U.S. at 25, 33 S.Ct. at 411–12 (citations omitted).

Distinguishing the basis of dismissal is particularly difficult in cases involving federal question jurisdiction under 28 U.S.C. § 1331, where the very statute that creates the cause of action often confers jurisdiction as well. Justice Black framed the analysis as follows:

> If the court [exercises] its jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction. The previously carved out exceptions are that a suit may sometimes be dismissed for want of jurisdiction where the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous.

*Bell v. Hood*, 327 U.S. 678, 682–83, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946) (citations and footnote omitted).

■ Although the federal courts have followed a general practice of granting jurisdiction in most cases and dismissing for lack of subject matter jurisdiction only under narrow circumstances, *see Spencer v. Casavilla*, 903 F.2d 171, 173 (2d Cir.1990); *Goldman v. Gallant Sec., Inc.*, 878 F.2d 71, 73 (2d Cir. 1989) (per curiam); *Lewis v. Knutson*, 699 F.2d 230, 237 (5th Cir.1983), a court must nevertheless dismiss for lack of subject matter jurisdiction—even if a federal claim is asserted on the face of the complaint—where the federal question "is so plainly insubstantial as to be devoid of any merits and thus [does] not present[ ] any issue worthy of adjudication." *Giulini v. Blessing*, 654 F.2d 189, 192 (2d Cir.1981); *see also Nowak*, 81 F.3d at 1188; *Town of West Hartford v. Operation Rescue*, 915 F.2d 92, 100 (2d Cir. 1990).

As the Second Circuit has stated, the test "is whether the federal ... claim was so insubstantial, implausible, or otherwise completely devoid of merit as not to involve a federal controversy." *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (2d Cir.1993); *see also AVC Nederland B.V. v. Atrium Inv. Partnership*, 740 F.2d 148, 152–53 (2d Cir.1984) ("when the contested basis of federal jurisdiction is also an element of plaintiff's asserted federal claim, the claim should not be dismissed for want of jurisdiction except when it appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous") (internal quotation marks omitted).

Accordingly, the Court will initially focus on Plaintiffs' federal claims, and with the

foregoing standard in mind, will address Defendants' Motions to Dismiss.

## A. Motion To Dismiss

Rule 12 of the Federal Rules of Civil Procedure provides that a cause of action shall be dismissed if the complaint fails "to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). Furthermore, a case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the court lacks the statutory or constitutional power to adjudicate the case.

In analyzing a motion to dismiss, the facts alleged by the plaintiff are assumed to be true and must be liberally construed in the light most favorable to the plaintiff. *See, e.g., Easton v. Sundram,* 947 F.2d 1011, 1014–15 (2d Cir.1991), *cert. denied,* 504 U.S. 911, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992). While the court need not accept mere conclusions of law, the court should accept the pleader's description of what happened along with any conclusions that can reasonably be drawn therefrom. *See Murray v. City of Milford,* 380 F.2d 468 (2d Cir.1967).

Furthermore, when a party makes a motion to dismiss, the court will limit its consideration to the facts asserted on the face of the complaint. *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989). A complaint will not be dismissed for failure to state a claim unless it appears, beyond a doubt, that the plaintiff can prove no set of facts that would entitle them to relief. *See Wanamaker v. Columbian Rope Co.,* 740 F.Supp. 127 (N.D.N.Y. 1990).

## B. Plaintiffs' Federal Claims

As previously discussed, Plaintiffs' Complaint must present a viable form of federal jurisdiction. Because Plaintiffs and Defendants are all citizens of New York, there is no basis for diversity jurisdiction, *see* 28 U.S.C. § 1332, and thus the Court's jurisdiction must be predicated on federal question jurisdiction. *See* 28 U.S.C. § 1331.

Plaintiffs attempt to implicate four provisions in the United States Constitution: the Constitution's guarantee of a "Republican Form of Government"; the "privileges and immunities" clause of the Fourteenth Amendment; the "equal protection" clause of the Fourteenth Amendment; and the First Amendment. Specifically, Plaintiffs assert that: the New York Farm Act, which provides property tax credits for agricultural land, violates the Republican Form of Government Clause of Article IV, the Privileges and Immunities Clause of the Fourteenth Amendment, and the Equal Protection Clause of the Fourteenth Amendment because it "discriminate[s] against plaintiffs and all other non-farmers" (Complaint 1 63); the provision of "thousands of 'member item' gifts" by state legislators violates the First Amendment, denies Plaintiffs their right to a republican form of government, and denies Plaintiffs the privileges and immunities of citizenship—although Plaintiffs' do not specifically state in their Complaint how these constitutional provisions are violated; the "taxpayer standing" rule in section 123–b of the State Finance Law violates the First Amendment, denies Plaintiffs their right to a republican form of government, and denies them the privileges and immunities of citizenship because it does not confer standing to challenge a bond issue; the Environmental Bond Act denies Plaintiffs their right to a republican form of government and denies them the privileges and immunities of citizenship because the Bond Act violates the New York State Constitution; and, finally, New York's procedure for choosing delegates to its constitutional conventions denies Plaintiffs their right to a republican form of government.

### i. Guarantee Clause

Plaintiffs argue that the New York Farm Act, "member item gifts" by state legislators, the State Finance Law, New York's Environmental Bond Act, and New York's procedure for choosing delegates to its constitutional conventions deny Plaintiffs their right to a republican form of government.

Article IV, section 4 of the United States Constitution provides that

[t]he United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application

of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence.

U.S. Const. art. IV, § 4. Not surprisingly, the Guarantee Clause has been an infrequent subject of litigation. Accordingly, the Supreme Court has warned:

> We approach the issue with some trepidation, because the Guarantee Clause has been an infrequent basis for litigation throughout our history. In most of the cases in which the Court has been asked to apply the Clause, the Court has found the claims presented to be nonjusticiable under the "political question" doctrine.

*New York v. U.S.*, 505 U.S. 144, 184, 112 S.Ct. 2408, 2432, 120 L.Ed.2d 120 (1992) *(citing City of Rome v. United States*, 446 U.S. 156, 182, n. 17, 100 S.Ct. 1548, 1564, n. 17, 64 L.Ed.2d 119 (1980) (challenge to the pre-clearance requirements of the Voting Rights Act); *Baker v. Carr*, 369 U.S. 186, 218–229, 82 S.Ct. 691, 710–716, 7 L.Ed.2d 663 (1962) (challenge to apportionment of state legislative districts); *Pacific States Telephone & Telegraph Co. v. Oregon*, 223 U.S. 118, 140–151, 32 S.Ct. 224, 227–231, 56 L.Ed. 377 (1912) (challenge to initiative and referendum provisions of state constitution)).

The view that the Guarantee Clause implicates only nonjusticiable political questions has its origin in *Luther v. Borden*, 48 U.S. (7 How.) 1, 12 L.Ed. 581 (1849), where the Court was asked to decide, in the wake of Dorr's Rebellion, which of two rival governments was the legitimate government of Rhode Island. The Court held that "it rests with Congress," not the judiciary, "to decide what government is the established one in a State." 48 U.S. at 42. Although over the following century this limited holding transformed into the general rule that "[v]iolation of the great guaranty of a republican form of government in States cannot be challenged in the courts," *Colegrove v. Green*, 328 U.S. 549, 556, 66 S.Ct. 1198, 1201, 90 L.Ed. 1432 (1946) (plurality opinion), this view has not always been accepted. In a group of cases decided before the holding of *Luther* became a general rule of nonjusticiability, the Supreme Court addressed the merits of claims founded on the Guarantee Clause without any

suggestion that the claims were non-justiciable. *See Kies v. Lowrey*, 199 U.S. 233, 239, 26 S.Ct. 27, 29, 50 L.Ed. 167 (1905); *Forsyth v. Hammond*, 166 U.S. 506, 519, 17 S.Ct. 665, 670, 41 L.Ed. 1095 (1897); *In re Duncan v. McCall*, 139 U.S. 449, 461–462, 11 S.Ct. 573, 577, 35 L.Ed. 219 (1891); *Minor v. Happersett*, 88 U.S.(21 Wall.) 162, 175–176, 22 L.Ed. 627 (1875).

In *New York v. United States*, the Supreme Court's most recent exposition on this issue, the Court discussed, but did not resolve, the question of when claims under the Guarantee Clause are justiciable. 505 U.S. at 182–86, 112 S.Ct. at 2432–33. Although the *New York* Court noted that since its decision in *Luther* most courts have concluded that violations of the Guarantee Clause cannot be challenged in the courts because they present nonjusticiable political questions, "not all claims under the Guarantee Clause present nonjusticiable political questions." *New York*, 505 U.S. at 184–85, 112 S.Ct. at 2433. Nonetheless, the *New York* Court ultimately found it unnecessary to "resolve this difficult question." 505 U.S. at 184–85, 112 S.Ct. at 2433.

The Second Circuit has been equally reticent in resolving the issue of when the Guarantee Clause presents a nonjusticiable political question. In *Padavan v. U.S.*, 82 F.3d 23 (2d Cir.1996) the Second Circuit noted that "[w]hile it is possible that 'perhaps not all claims under the Guarantee Clause present nonjusticiable political questions,' there is no basis for us to say that the plaintiffs here have presented a justiciable claim." *Id.* at 28 (addressing whether federal immigration policies deprived New York State of a republican form of government). Accordingly, this Court is left with scant guidance in determining when the general rule of nonjusticiability should be abrogated.

Furthermore, Plaintiffs themselves provide little aid in the Court's resolution of this issue; they offer no further explanation of their argument nor do they cite any relevant case law in support of their position. The Court can find few cases where the Guarantee Clause has been invoked to invalidate the actions of a state itself. On the contrary, when the Guarantee Clause is invoked, it is

invariably done so in an effort to challenge an action of the *federal government*. *See, e.g., In re Duncan v. McCall*, 139 U.S. 449, 461, 11 S.Ct. 573, 577, 35 L.Ed. 219 (1891) (addressing rights of states to choose their own government officials and pass their own laws); *Bauers v. Heisel*, 361 F.2d 581, 588 (3d Cir.1966) (separate and independent state judiciary); *Taylor v. Beckham*, 178 U.S. 548, 570–71, 20 S.Ct. 890, 898–99, 44 L.Ed. 1187 (1900) (prescribing the qualifications of state officers); *U.S. v. Downey*, 195 F.Supp. 581, 585 (S.D.Ill.1961)(addressing right of state courts to be free of federally imposed rules of criminal procedure).

In light of the Guarantee Clauses' implicit protection of state governmental processes from the tyranny of an all-powerful federal sovereign, it would seem imprudent on the part of the federal judiciary to allow the Clause to be used to challenge a state's own lawmaking. For example, in 1912, the Supreme Court addressed a challenge to the referendum provisions of the Oregon Constitution. *See Pacific States Telephone & Telegraph Co. v. Oregon*, 223 U.S. 118, 32 S.Ct. 224, 56 L.Ed. 377 (1912). Chief Justice White, writing for the majority, found the challenge nonjusticiable and described the claim as follows:

> It is the government, the political entity, which (reducing the case to its essence) is called to the bar of this court, not for the purpose of testing judicially some exercise of power, assailed on the ground that its exertion has injuriously affected the rights of an individual because of repugnancy to some constitutional limitation, but to demand of the state that it establish its right to exist as a state, republican in form.

*Pacific States Telephone & Telegraph*, 223 U.S. at 150–51, 32 S.Ct. at 231. Such a claim, the Court concluded is "political in character, and therefore not cognizable by the judicial power, but solely committed by the Constitution to the judgment of Congress." *Pacific States Telephone & Telegraph*, 223 U.S. at 133, 32 S.Ct. at 224. Furthermore, the Tenth Circuit, in addressing the purpose of the Guarantee Clause noted:

In *American Constitutional Law* § 5–23, the Guarantee Clause is discussed in the following manner:

> The most fundamental threats to state sovereignty—those that genuinely portend reduction of the states into "field offices of the national bureaucracy" or "bureaucratic puppets of the Federal Government"— would seem to arise less from federal laws that impose substantive constraints on state and private actors alike ... than from federal laws that restructure the basic institutional design of the system a state's people choose for governing themselves. If there is any form of congressional assault that might truly " 'nibble away at state sovereignty, bit by bit, until someday essentially nothing is left but a gutted shell,' " it is an assault on those democratic processes through [which] citizens ... retain the power to govern.

*Kelley v. U.S.*, 69 F.3d 1503, 1510–11 (10th Cir.1995), *cert. denied sub nom, Kelley v. Department of Justice*, —— U.S. ——, 116 S.Ct. 1566, 134 L.Ed.2d 665 (1996).

Consequently, there is no basis for this Court to conclude that Plaintiffs have presented a justiciable claim. Thus, Plaintiffs' claims implicating the Guarantee Clause must be dismissed.

### ii. Privileges and Immunities Clause

■ Plaintiffs also argue that the New York Farm Act, "member item gifts" by state legislators, the State Finance Law, and New York's Environmental Bond Act deny Plaintiffs their privileges and immunities of citizenship.

■ Article IV, § 2, cl. 1, of the Constitution provides that the "Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." The provision was designed "to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned." *Paul v. Virginia*, 75 U.S.(8 Wall.) 168, 180, 19 L.Ed. 357 (1869); *see also Toomer v. Witsell*, 334 U.S. 385, 395, 68 S.Ct. 1156, 1162, 92 L.Ed. 1460 (1948). As

Justice Bradley remarked in the *Slaughter House Case:*

> The "privileges and immunities" secured by the original constitution, were only such as each state gave to its own citizens. Each was prohibited from discriminating in favor of its own citizens, and against the citizens of other states.
>
> But the fourteenth amendment prohibits any state from abridging the privileges or immunities of the citizens of the United States, whether its own citizens or any others. It not merely requires equality of privileges; but it demands that the privileges and immunities of all citizens shall be absolutely unabridged, unimpaired.

*Live-Stock Dealers' & Butchers' Ass'n v. Crescent City Live–Stock Landing & Slaughter–House Co.,* 15 F.Cas. 649, 652 (C.C.La. 1870) (No. 8408).

Derived, like the Commerce Clause, from the fourth of the Articles of Confederation, the Privileges and Immunities Clause was intended to create a national economic union.[1] *See Supreme Court of New Hampshire v. Piper,* 470 U.S. 274, 279–80, 105 S.Ct. 1272, 1276, 84 L.Ed.2d 205 (1985). Indeed, Charles Pinckney, who drafted the original Privileges and Immunities Clause, stated that it was "formed exactly upon the principles of the 4th article of the present Confederation." 3 M. Farrand, Records of the Federal Convention of 1787, p. 112 (1911).

▮ However, the Privileges and Immunities Clause does not infuse citizens with new and independent rights. The Clause "establishes a norm of comity without specifying the particular subjects as to which citizens of one State coming within the jurisdiction of another are guaranteed equality of treatment." *Austin v. New Hampshire,* 420 U.S. 656, 660, 95 S.Ct. 1191, 1194, 43 L.Ed.2d 530 (1975). Justice Miller made this distinction explicit in *Bradwell v. State of Illinois,* 83 U.S.(16 Wall.) 130, 138, 21 L.Ed. 442

(1872), where, speaking of the privileges and immunities provision he said that "[t]he protection designed by that clause, as has been repeatedly held, has no application to a citizen of the State whose laws are complained of. If the plaintiff was a citizen of the State of Illinois, that provision of the Constitution gave her no protection against its courts or its legislation." More than fifty years later, Justice Sutherland noted:

> This does not mean that a state has unlimited power by law to abridge the privileges of. its own citizens. It only means that in such case we must look elsewhere than to the language of the privileges and immunities clause of the Fourth Article of the Constitution for the constitutional infirmity of the statute, if it have any.

*Colgate v. Harvey,* 296 U.S. 404, 428–29, 56 S.Ct. 252, 258, 80 L.Ed. 299 (1935)

More recently, in *Zobel v. Williams,* the Supreme Court rejected a challenge to Alaska's dividend scheme, which provided for proportional payments based on length of residency within the state, holding:

> The statute does not involve the kind of discrimination which the Privileges and Immunities Clause of Art. IV was designed to prevent. That Clause "was designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy." *Toomer v. Witsell,* 334 U.S. 385, 395, 68 S.Ct. 1156, 1161, 92 L.Ed. 1460 (1948). The Clause is thus not applicable to this case.... When a state distributes benefits unequally, the distinctions it makes are subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment.

457 U.S. 55, 59, 102 S.Ct. 2309, 2312, 72 L.Ed.2d 672 (1982).

Therefore, as citizens of the State of New York challenging the legislative and executive actions of their own state, Plaintiffs have no recourse to the Privileges and Immunities

---

1. Article IV of the Articles of Confederation provided:

 The better to secure and perpetuate mutual friendship and intercourse among the people of the different States in this Union, the free inhabitants of each of these States ... shall be entitled to all privileges and immunities of free citizens in the several States; and the people of each State shall have free ingress and regress to and from any other State, and shall enjoy therein all the privileges of trade and commerce, subject to the same duties, impositions and restrictions as the inhabitants thereof....

Clause. Accordingly, Plaintiffs' claims implicating the Privileges and Immunities Clause must also be dismissed.

### iii. Equal Protection

█ Plaintiffs argue that the New York Farm Act, which provides property tax credits for agricultural land, violates the Equal Protection Clause of the Fourteenth Amendment because it "discriminate[s] against plaintiffs and all other non-farmers" (Complaint ¶ 63). Essentially, Plaintiffs, who are neither farmers nor owners of agricultural land, assert that their constitutional rights are violated because "[t]he statutory classification is ... based upon a 'suspect classification,' i.e., political favoritism." (Pltfs' Mem. of Law at 16).

█ Defendants correctly note that Plaintiffs' burden in pleading that a statute violates the Equal Protection Clause requires more than their pointing out that the statute creates a classification. Indeed, it is the very nature of legislation to classify. *See, e.g., Lyng v. Automobile Workers,* 485 U.S. 360, 370, 108 S.Ct. 1184, 1192, 99 L.Ed.2d 380 ("drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one"); *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 314, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976).

█ Moreover, tax legislation enjoys the greatest degree of freedom to classify. For example, in *Madden v. Kentucky,* 309 U.S. 83, 60 S.Ct. 406, 84 L.Ed. 590 (1940), the Supreme Court reasoned:

> The broad discretion as to classification possessed by a legislature in the field of taxation has long been recognized. This Court fifty years ago concluded that "the fourteenth amendment was not intended to compel the states to adopt an iron rule of equal taxation," and the passage of time has only served to underscore the wisdom of that recognition of the large area of discretion which is needed by a legislature in formulating sound tax policies.... It has, because of this, been pointed out that in taxation, even more than in other fields, legislatures possess the greatest freedom in classification.

*Id.* at 87–88, 60 S.Ct. at 408. Accordingly, the *Madden* Court held that "the presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes. The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." 309 U.S. at 88, 60 S.Ct. at 408.

Plaintiffs specious argument that New York's Farm Act violates the Equal Protection Clause, because the statutory classification is a "suspect classification," demonstrates Plaintiffs' utter disregard for constitutional jurisprudence on this issue.

The concept of a "suspect classification" saw its genesis in the famous *Carolene Products* footnote. In *United States v. Carolene Products Co.,* 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938), the Court wrote that it did not have to inquire "whether prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry." *Carolene Products,* 304 U.S. at 152–153 n. 4, 58 S.Ct. at 783 n. 4.

Here, it is ludicrous to consider non-farmers a "discrete and insular minorit(y)" unable to employ the "political processes ordinarily to be relied upon," when non-farmers clearly constitute a majority of the electorate. Although courts have at times used an intermediate standard of review for gender-based classifications, *see, e.g., Craig v. Boren,* 429 U.S. 190, 204, 97 S.Ct. 451, 460, 50 L.Ed.2d 397 (1976), and occasionally an undefined, but heightened, review standard for classifications based on illegitimacy, *see* L. Tribe, American Constitutional Law § 16–23, at 1057 (1978), there are only three suspect classifications: race, alienage, and national origin. *See City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985) (recognizing only race, alienage, and national origin as suspect classifications).

■ Consequently, Plaintiffs' impassioned attempt to convince this Court that non-farmers are a suspect classification under the Equal Protection Clause necessarily must fail along with the many other classifications that courts have deemed non-suspect. To illustrate, age is not a suspect classification, *see Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 313–314, 96 S.Ct. 2562, 2566–2567, 49 L.Ed.2d 520 (1976), classification based on choice of sexual partners is not a suspect classification, *see National Gay Task Force v. Bd. of Educ. of City of Oklahoma City*, 729 F.2d 1270, 1273 (10th Cir. 1984), *aff'd*, 470 U.S. 903, 105 S.Ct. 1858, 84 L.Ed.2d 776 (1985), the classification between prison escapees and other fugitives is not a suspect classification, *see Beauchamp v. Murphy*, 37 F.3d 700, 707 (1st Cir.1994), juvenile delinquency is not a suspect classification, *see United States ex rel. Martin v. Strasburg*, 513 F.Supp. 691, 706 (S.D.N.Y. 1981), *aff'd*, 689 F.2d 365, 374 (2d Cir.1982), *rev'd on other grounds sub nom, Schall v. Martin*, 467 U.S. 253, 281, 104 S.Ct. 2403, 2418, 81 L.Ed.2d 207 (1984), students of unaccredited law schools are not a suspect classification, *see Lupert v. California State Bar*, 761 F.2d 1325, 1328 (9th Cir.1985), and seamen are not a suspect class. *See Jones v. Reagan*, 748 F.2d 1331, 1337 (9th Cir.1984).

■ It is equally plain that Plaintiffs do not have a fundamental interest in holding on to their tax dollars. Accordingly, "in cases where a classification burdens neither a suspect group nor a fundamental interest, 'courts are quite reluctant to overturn governmental action on the ground that it denies equal protection of the laws.'" *Gregory v. Ashcroft*, 501 U.S. 452, 470–71, 111 S.Ct. 2395, 2406, 115 L.Ed.2d 410 (1991) (*quoting Murgia*, 427 U.S. at 314, 96 S.Ct. at 2567).

■ Because there is no suspect classification involved, nor any deprivation of fundamental rights, the ordinary equal protection test is extremely deferential: a non-suspect classification is unconstitutional only if no legitimate basis can be found to support it. *See, e.g., Harrah Independent School District v. Martin*, 440 U.S. 194, 99 S.Ct. 1062, 59 L.Ed.2d 248 (1979). "[S]upport" means only that a legislature could provide a rational basis for the choice. *See, e.g., Vance v. Bradley*, 440 U.S. 93, 111, 99 S.Ct. 939, 949, 59 L.Ed.2d 171 (1979).

Applying this deferential standard to the facts here, the Court can only conclude that the Farm Act is rationally related to a legitimate governmental purpose: the support of farmers and farming through tax relief. *(See* Defs' Appendix 5; New York Agricultural Statistics 1994–1996 and 1995–1996). Thus, Plaintiffs' cause of action challenging New York's Farm Act is dismissed.

### iv. First Amendment

■ Plaintiffs only remaining federal claim is that defendants Pataki, Finnegan, and Sheffer's advocacy in favor of the Environmental Bond Act violated Plaintiffs' right to "cast an effective vote, the right to a free election, and the right to advance political ideas." (Pltfs' Mem. of Law at 12). In addition, Plaintiffs argue that "[t]hose rights were denied by defendants Pataki, Finnegan and Sheffer as they propagandized for the vote and as they actively campaigned for passage.of the Bond Act and exhorted the electorate to 'vote yes'." (Pltfs' Mem. of Law at 12).

However, Plaintiffs offer no further explanation of their argument nor do they cite any relevant case law in support of their position.[2] Moreover, the Court can find no precedent for the assertion that a party's political advocacy can affirmatively infringe another's First Amendment right to free speech or a free election. Indeed, to accept this argument, the Court would necessarily be limiting the free speech rights of defendants Pataki, Sheffer, and Finnegan; a posi-

---

2. Plaintiffs argument that defendants Pataki, Finnegan, and Sheffer's advocacy violates the New York Constitution and thus the First Amendment is also unavailing. Notwithstanding the fact that it is dubious whether defendants acted in contravention of the New York Constitution, there is simply no basis for the assertion that the federal constitution prohibits individuals, including state actors acting in contravention of a state constitution, from expressing their personal beliefs regarding pending legislation or referenda. Plaintiffs' attempt to "bootstrap" their state law claim into the First Amendment must be rejected.

tion that the First Amendment, and this Court, will not countenance.

Accordingly, Plaintiffs' First Amendment claims are without merit and must also be dismissed.

### C. Plaintiffs' State Law Claims

As noted previously, federal courts are courts of limited jurisdiction. Thus, in order to address Plaintiffs' state law causes of action, a two-fold inquiry must initially be made: (1) whether this Court has the judicial power to decide the state law claim, and (2) assuming such power exists, whether this Court should, in the exercise of its discretion, decline Plaintiffs' invitation to adjudicate the state law claims.

■ In *Osborn v. Bank of the United States,* 22 U.S. (9 Wheat) 738, 6 L.Ed. 204 (1824), Chief Justice Marshal wrote:

When a question to which the judicial power of the union is extended by the Constitution, forms an ingredient of the original cause, it is in the power of Congress to give the circuit courts jurisdiction of that case, although other questions of fact or law may be involved in it.

22 U.S. at 823. Although this concept of pendent jurisdiction was born in the early part of the 19th Century, it has proved a troublesome concept to apply. In *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Supreme Court formulated the current standard to determine when a district court possesses the judicial power to exercise jurisdiction over a pendant state claim: "The Federal claim must have substance sufficient to confer subject matter jurisdiction on the court [and] the state and federal claims must derive from a common nucleus of operative fact." *Gibbs,* 383 U.S. at 725, 86 S.Ct. at 1138.

■ As to the first prong of this standard, in the Second Circuit the test "is whether the federal ... claim [is] so insubstantial, implausible, or otherwise completely devoid of merit as not to involve a federal controversy." *IUE AFL–CIO Pension Fund,* 9 F.3d at 1056. As discussed previously, Plaintiffs' claims implicating the Guar-

antee Clause, Privileges and Immunities Clause, Equal Protection Clause, and First Amendment are completely devoid of merit.

■ However, the Court need not determine conclusively whether Plaintiffs' claims are so insubstantial as to negate federal jurisdiction because pendent jurisdiction is a matter of judicial discretion. The Court in *Gibbs* stated that "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." 383 U.S. at 726, 86 S.Ct. at 1139. Even before Congress passed the supplemental jurisdiction statute, *see* 28 U.S.C. § 1367, courts in this circuit, with rare exception, adhered to the rationale articulated in *Gibbs. See Crane Co. v. American Standard, Inc.,* 603 F.2d 244, 245 (2d Cir.1979) ("pendent state claims must be dismissed if it later is determined that there never existed a federal claim sufficient to invoke the jurisdiction of the federal court."); *Abrams v. Carrier Corp.,* 434 F.2d 1234 (2d Cir.1970); *Rogers v. Valentine,* 426 F.2d 1361 (2d Cir.1970) (no abuse of discretion to refuse to exercise pendent jurisdiction after dismissal of federal claim).

■ Under 28 U.S.C. § 1367, "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if .. (3) the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). Moreover, the Court notes that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139; *see also Young v. New York City Transit Authority,* 903 F.2d 146, 163–64 (2d Cir.1990). "A district court ought not 'reach out for ... issues, thereby depriving state courts of opportunities to develop and apply state law.' " *Young,* 903 F.2d at 164 (*quoting Mayer v. Oil Field Systems Corp.,* 803 F.2d 749, 757 (2d Cir.1986)).

■ Furthermore, exercising supplemental jurisdiction over claims based on the New York Constitution "would violate fundamental principles of federalism and comity" be-

cause "New York State has a definite interest in determining whether its own laws comport with the New York Constitution." *Young,* 903 F.2d at 163–64; *see also* 28 U.S.C. § 1367(c)(1) (district courts may decline to exercise supplemental jurisdiction if "the claim raises a novel or complex issue of State law").

Therefore, in light of the dismissal of all federal claims in this action, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.

## III. CONCLUSION

It is therefore **ORDERED,** that Plaintiffs' Complaint is DISMISSED in its entirety. Plaintiffs' federal claims are dismissed with prejudice. Plaintiffs' state law claims are dismissed without prejudice.

IT IS SO ORDERED.